## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**RACHEL G.**, et al.                                    :
                                                        :
           Plaintiffs,                                  :           CIVIL ACTION
                                                        :
v.                                                      :
                                                        :
**DOWNINGTOWN AREA**                                    :
**SCHOOL DISTRICT**,                                    :           NO.    09-CV-3512
                                                        :
           Defendant.                                   :


## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

       This is a special education tuition reimbursement claim against the Downingtown

Area School District for its failure to provide Rachel G. with a free appropriate public

education ("FAPE") during the 2007-8 school year .  Pursuant to judicial review

provision of the IDEA, 20 U.S.C. § 1415 (i),[1] Rachel and her parents seek reversal of the

---

       [1]       As amended, 20 U.S.C. 1400, *et seq*., entitled Individuals with Disabilities
Education Improvement Act of 2004.  Under the IDEA, a student may be entitled to
reimbursement for private school tuition if a federal court concludes both that the public
placement violated IDEA and that the private placement was proper.  *School Committee
of Burlington v. Department of Educ.,* 471 U.S. 359 (1985); *Florence County School
District Four v. Carter,* 510 U.S. 7 (1993).  *Accord Montgomery Twp. Bd. of Educ. v.
S.C.,* 135 Fed. Appx. 534 (3rd Cir. 2005).  "An order awarding reimbursement of private
education costs when a school district fails to provide FAPE merely requires the district
to belatedly pay expenses that it should have paid all along." *Forest Grove v. T.A.,* 557
U.S. 10 (2009;  *School Committee of Burlington v. Department of Education*, 471 U.S.
359 (1985).

May 3, 2009 decision of the Hearing Officer below, who denied their request for tuition reimbursement.[2]

Due to congenital birth defects including a cleft lip and palate and Lobar Holoprosencephaly (HPE), pursuant to which the hemispheres of her brain are not properly separated, Rachel has a constellation of severe language-based disabilities that severely impacts her ability to learn and communicate. She also has severe apraxia of speech, which further complicates her ability to plan and execute verbal communication. Since November 15, 2005 Rachel has attended a day program at the TALK Institute and School, located in Newtown Square, Pennsylvania.[3]  Complaint and Answer at ¶39. TALK is a private academic school licensed to provide special education to students such as Rachel who have severe speech and language impairments.[4]  HO FF No. 42; P-86.[5]

_____

[2]    Although the Complaint also alleges a claim for discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq*., ("Section 504"), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§12101 *et seq*. ("ADA"), those issues will not be addressed in this motion.  By agreement between the parties and the Court, the discrimination claims will be visited, if at all, after the Court's initial disposition of cross-motions for Summary Judgment as to Count I of Rachel's complaint.

[3]    TALK was previously known as the "Magnolia School". HO Decision at 2 ; N.T. at 44.  TALK is licensed by the Pennsylvania Department of Education (PDE) to provide special education for students from ages 3-21.  N.T. at 390.  All of TALK's academic curricula, including reading, math, social studies, and science are PDE-approved.  N.T. at 390; 409; 423.  Eighty percent (80%) of TALK's students are funded by their home school districts.  N.T. at 390.  Rachel herself was supported by her District for almost two years.

[4]    TALK's website, located at http://www.talkinc.org/therapy.html, identifies itself as a school devoted to treating speech and language disorders through an integrated program  that makes no artificial distinctions between clinical therapeutics and education.  *See also* N.T. at 868; 1551.

[5]    The Hearing Officer's Decision below was divided into two primary sections. Findings of Fact will be designated herein as HO FF No. __."  References to the analytical portion of her decision will be designated "Decision at  __."

At TALK, Rachel's educational program is fully integrated with an intensive program of related services and accommodations which focuses directly on improving her ability to use receptive and expressive language.  Rachel's ability to speak, communicate, and relate to others, while still significantly impaired, has improved dramatically since she began attending TALK.  Consequently, Rachel's ability to read and learn academic material has also improved.  In August, 2007, having been advised by its own independent expert that Rachel was making good progress at TALK, the District advised Rachel's parents that it was discontinuing its financial support for Rachel's placement because she was not making progress.

**SCOPE OF REVIEW**

Parents who pursue due process remedies under the IDEA but are dissatisfied with the result have the right to judicial review.  20 U.S.C. §1415 (I)(2)( C).  The IDEA provides for "modified *de novo* review," which requires the court to (1) receive the records of the administrative proceedings; (2) hear additional evidence at the request of a party; and (3) basing its decision on the preponderance of the evidence, grant the relief that the court determines to be appropriate.[6]  *S.H. v. State Operated School District of the City of Newark,* 336 F.3d 260, 270 (3ʳᵈ Cir. 2003)*; Carlisle Area School v. Scott P.,* 62 F.3d 520, 529 (3ʳᵈ Cir. 1995).  Thus, "[j]udicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Penn Trafford School District v. C.F.,* 2006 U.S. Dist. LEXIS 13581 (March 28, 2006), *citing Susan N.  v. Wilson School District,* 70 F.3d 751, 757 (3ʳᵈ

---

[6]     The parties have agreed at this juncture to file cross-motions for summary judgment based on the existing record without prejudice to either party to request that the Court supplement the record if they are dissatisfied with the Court's decision.

Cir. 1995).  In IDEA cases, although the District Court must accord the decision of the state agency "due weight", it has discretion to reach an independent decision." *S.H., supra,* 336 F.3d at 269**;** *Scott P., supra,* 62 F.3d at 527; *Rowley,* 458 U.S. at 206*; Penn Trafford School District, supra,*  2006 U.S. Dist. LEXIS 13581 (March 28, 2006)*.*  District Courts have discretion to determine how much deference to accord the administrative proceedings, if any, and are free to accept or reject the Hearing Officer's factual findings.  *S.H., supra,* 336 F.3d at 270;  *Scott P., supra,* 62 F.3d at 526**;** *Oberti,* 995 F.2d 1204 at 1219.  The District Court's legal analysis, of course, is plenary. *Montgomery Twp. Bd. of Educ. v. S.C.,* 135 Fed. Appx. 534, 536 (3rd Cir. 2005); *Rose v. Chester County IU,* 1996 U.S. Dist. LEXIS 6105 * 22 (E.D. Pa. 1996).  While District courts must consider the factual findings in the administrative proceedings to be *"prima facie* correct" and defer to the HO's credibility determinations,  *Lauren W. v. Radnor Twp. Sch. Dist.,* 480 F.3d 259 (3rd Cir. 2007), they may not simply rubber stamp administrative decisions.  *L.G. v. Bd. of Educ. of Hyde Park,* 368 F. Supp. 2d 313, 323 (S.D.N.Y. 2005).  Ordinarily a District Court must find support for any factual conclusions contrary to the ALJ's in the record before it.  Likewise, the Court must explain why it does not accept the ALJ's findings of fact to avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews.  *S.H., supra,* 336 F.3d at 270*; Scott P., supra,* 62 F.3d at  526.[7]

---

[7]     The parties typically litigate IDEA cases in federal court through cross-motions for summary judgment.  Under the provisions of IDEA §1415, a party may be entitled to relief even if the facts he/she relies upon are disputed, notwithstanding the general provision of Rule 56.

**CHRONOLOGY OF THE PRESENT DISPUTE**

    **1.**    **Rachel's Disability and Summary Of Her Educational Needs**

    Rachel G., now twelve-years old, was born on January 11, 1998 with

apparent facial malformations including a severe cleft lip and palate.[8]  HO FF No. 2;

Complaint and Answer, ¶ 26.  As an infant, Rachel was diagnosed with Lobar

Holoprosencephaly ("Lobar HPE").  Complaint and Answer, ¶ 27.  This gestational

defect results from a malformation of the corpus collusum, the fibrous bundle of nerves

that connects the two hemispheres of the brain, preventing them from separating

properly.  This, in turn,  interferes with the transfer of information from one side of the

brain to the other.  HO FF 3; P-89.  Functionally, this impairs the child's ability to

integrate information and execute a variety of tasks.  N.T. at 1302-3.

    Few individuals with HPE are born alive.  Most who survive either die soon

after birth or experience severe disabilities.  N.T. at 1304.  Most never acquire any

capacity for self-care and they have little or no capacity to communicate with others.

HO FF. No. 5; P-89 at 1.  Those who do survive suffer from significant speech and

articulation deficits.  N.T. at 1103.   Accordingly, Rachel's  disabilities include a severe

delay in the development of receptive and expressive language.  This, in turn, impedes

her ability to learn to read, write, and acquire other academic skills.  P-58 at 9.  Experts

have concluded that in light of her HPE, Rachel's academic skills are "extraordinary"

_____

    [8]    In 1998 Rachel underwent two separate surgeries to repair her cleft lip and
palate.  N.T. at 637.  Her oral structures, while certainly improved over how they were
formed at birth, have not been corrected completely.  They continue to impact her
ability to articulate certain sounds.  N.T. at 1539.  At some point in the future, Rachel
will be undergoing further surgery to address some of those remaining structural
problems.  N.T. at 639.  References to the Note of Testimony will be designated "N.T.
at __".

and "approach the unique".   HO FF No. 5.  However, the HPE has left her with

significant cognitive deficits which impact her ability to learn.  Complaint and Answer

at ¶29.   Like most children who survive with HPE, Rachel has better receptive than

expressive speech.  N.T. at 1110.

In addition to the problems Rachel inherited by virtue of her HPE, she has

a complicated array of other disabilities.   She has apraxia of speech, a neurological

disorder characterized by a diminished ability to execute or carry out learned

purposeful movements.  Complaint and Answer at ¶30; N.T. at 84; 479; 1091.  This

impairment almost always affects speech, language, and overall cognitive organization.

N.T. at 1093.   Rachel's case is no exception.  Both her speech and her language are

also disordered.  N.T. at 1103.   Rachel's apraxia and other disabilities impede her

ability to use form and execute words.  Likewise, she has problems with the conceptual

use of words, grammar, and  syntax and with pulling words from her memory for

effective communication.  N.T. at 1275.  The harder she thinks about it, the more

difficulty she has with language formulation.  *Id.*  N.T. at 1191.[9]  Indeed, one of the

experts during the due process hearing emphasized that Rachel's apraxia, together with

her HPE, result in Rachel presenting with disordered skills, not just skill delays.  N.T.

at 1103.

---

[9]   Apraxia (sometimes called "dyspraxia") is a neurological deficit relating to sequencing and motor movements of the articulators for speech.  N.T. at 479; 1091. Some children with apraxia have language ability but have difficulties communicating because they cannot coordinate and sequence their articulators to produce the sound they have in mind.  Other children, like Rachel, have an apraxic interference with language formulation as well as speech production.  N.T. at 1095; 1129.

Rachel's speech and language impairments are significantly complicated by sensory integration deficits. They impede her ability to process sensory stimuli and significantly impair her ability to write and perform other tasks involving fine and gross motor skills. Her sensory deficits, compacted by her apraxia, cause her to be impulsive and distractible. N.T. at 1316. Likewise, her postural control, motor planning and emotional responses are all impacted by her difficulty with sensory stimuli. N.T. at 129; IEP's P-60 at 10-12.

Although it is difficult to completely identify which of Rachel's various impairments create each of her skill deficits, there is no question that her apraxia greatly exacerbates her speech and language impairments as well as her other academic skills. N.T. at 1314. Most significantly, apraxia impacts her ability to speak clearly and produce age-appropriate speech. Rachel's speech is manifested by speech errors and distortions which impact on her intelligibility. N.T. at 84. She has articulation difficulties, abnormal voice and intonation, and frequent vocabulary and/or syntax errors. N.T. at 602; 1495. Even when Rachel is able to form an intent to communicate, she has difficulty making herself understood. In response to a question or academic task, for instance, Rachel may know more than she can say or demonstrate. She may know the answer, but may be unable to produce the motor response necessary to consistently to generate the required response on demand. N.T. at 1319; 1497. This produces major difficulties for those charged with ascertaining her academic progress. N.T. at 1320. Rachel's ability to show her skills is inconsistent. It is difficult or impossible to tell whether an incorrect response on Rachel's part demonstrates a lack of knowledge or merely exposes her language deficit. N.T. at 1319. As one expert expressed it, if Rachel "said the same thing four times, she would say it differently

every time." N.T. at 1128.  Likewise, if she were "given the same test every day, she would probably make different mistakes every time."  N.T. at 1205.

Due to the impact of Rachel's HPE, her apraxic speech, and other disabilities, cognitive measures and other standardized achievement tests are of limited value in predicting her learning potential or evaluating her acquisition of academic skills.  HO FF No. 6; P-89 at 2; N.T. at 1188; 1310-16.   Although Rachel has been identified as mentally retarded on formal cognitive assessments, she does not have the typical profile of a child with retardation.[10]  Due to her brain damage, her skills are scattered, but her functional skills are greater than would be predicted based on her low test scores.  HO FF No. 4.  In some areas, Rachel performs similarly to her typically-developing age mates while in others, particularly communication and academic skills, she is years behind.  HO FF No. 4, 8.   No matter what she accomplishes, Rachel may be never able to show her  progress on a standardized test.  N.T. at 1200; 1450; 1457.

_____

[10]    Mental retardation means significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period, that adversely affects a child's educational performance. 34 C.F.R. §300.7 (6).  From the time she was a small child, Rachel's adaptive functioning was closer to age-level than her tested cognitive performance. Rachel has functional skills greater than would be predicted by her low standardized scores.  As the Hearing Officer pointed out, she engages others in conversation, helps out around the home, displays self-confidence, an appropriate sense of humor, and independence in familiar and non-familiar environments such as home, church and restaurants.  She participates in developmentally typical social activities such as Girl Scounts and sports."  HO FF No. 8.  *See generally* N.T. at 1375 (comparing kids with tested I.Q.'s like Rachels who generally are not verbal, not toilet trained and very profoundly impaired).

The District's independent evaluator, Dr. Nancy Bloomfield, emphasized to the District as early as October, 2004 that the low assessments of Rachel's adaptive functioning were not valid, having been "significantly depressed by her language disorder."  P-23 at 2 & 4. This has proven true over time, as Rachel has consistently performed better on tests of adaptive functioning as she has acquired better speech and language skills.  N.T. at 1458.

As one expert explained it, there is no normative reference for a person like Rachel. N.T. at 1451.

Because of her apraxia and her neurological distractibility, Rachel's academic progress is tied directly to her speech and language delays.  P-58 at 9; P-89.  These disabilities greatly impact the design of an appropriate special education program for her.  N.T. at 482.   Rachel's academic progress flows from her acquisition of speech and language, not the other way around.  Therefore, her educational program needs to be driven by speech and language therapists who know how to translate Rachel's acquisition of speech and language skills into a classroom setting.  N.T. at 1265 .  She requires a highly individualized educational approach to speaking, reading and writing involving high levels of coordination between her teachers and therapists.   N.T. at 1261.  As the Hearing Officer pointed out, Rachel needs a program of specially designed remediation with maximum feedback and monitoring.  HO FF No. 37.  She progresses slowly and she  requires concepts to be taught "explicitly and repeatedly." Once she does grasp a concept she usually retains it.   HO FF No. 7; N.T. at 1110. With respect to speech and language instruction, Rachel's apraxia requires an approach that focuses heavily on drill and repetition.  N.T. at 1257.  She needs direct and explicit instruction in syntax, formulating, and organizing language and word retrieval.  N.T. at 1275.  Her distractibility requires that her speech and language program be highly individualized and be delivered 1-1.  N.T  at 472; 489.

### 2.      Rachel's Educational Program Prior To Her Attendance at TALK

Rachel was eligible for educational services from the District from the time she turned three (3).  She began kindergarten during the 2004-5 school year.   Complaint and Answer at ¶42.

As a child with HPE, Rachel's communication impediments are the biggest barriers she faces in acquiring age-appropriate social and academic skills. Both Rachel's speech and her language must be aggressively addressed before brain maturation forecloses her ability to develop the competent speech and language skills she will need to become an independent adult. N.T. at 752; 786. The District's speech and language therapist noted that the most critical time for Rachel's development in the area of speech and language was during the few years preceding the hearing. N.T. at 1499. From the outset experts emphasized to Rachel's parents that she would need intensive speech and language intervention at an early age as this was the area in which she had the most significant deficits. P-48; N.T. at 616; 634; 660; 949; 962. As her mother succinctly queried during the due process hearing, "if [Rachel] can't talk and communicate, what's her life going to be like?" N.T. at 752.

### a.    Kindergarten

For Kindergarten, the District placed Rachel in a "life skills" special education program in the morning and a regular education classroom in the afternoon with a 1-1 aide. HO FF No. 11. In spite of her severe speech and language disorders, she was receiving only 90 minutes per week of speech, 60 of which were delivered individually. She also received 60 minutes of occupational therapy, and just 30 minutes per week of physical therapy. P- 20 at 18.

It was clear to Rachel's parents that her speech and language delays were impeding her ability to acquire academic skills and impacting upon her ability to function socially at school. Because she was able to recognize the difference between her own speech skills and those of her peers, she was reticent to speak. N. T. at 205;

474; 929.  Rachel needed one-to-one facilitation in order to communicate with other children. N.T. at 275-6; 667; 930; 980.[11]

With the District's knowledge, Rachel's parents were supplementing Rachel's school program with private speech services at their own expense.  HO FF No.10; N.T. at 675.[12]  However, this was not an effective substitute for the type of intensive and fully integrated speech and language program Rachel needed to make progress toward age-appropriate communication.  Rachel's parents asked the District to provide more intensive school-based speech and language services.  They also requested an independent evaluation to provide a more comprehensive assessment of her speech and

_____

[11]     The Hearing Officer curiously cited to testimony by Mrs. Hoff, Rachel's life skills teacher during Kindergarten and the first two months of First Grade, who contradicted all the experts by claiming that Rachel would "spontaneously tell stories and recount goings on in her every day life."  HO FF No. 9, N. T. at 927-8.  This is the type of credibility determination which is owed no deference, even if it were relevant.  Because this is not a claim for compensatory education or tuition reimbursement for Kindergarten or First Grade, the Hearing Officer's recitation of this snippet from Mrs. Hoff's testimony has no bearing on the outcome of this case.  It does provide, however, some clues to the Hearing Officer's personal opinions about what Rachel needed even before the 2007-08 school year, although those issues were not before her.   The District itself agreed that Rachel needed a more intensive speech and language program and made applications on Rachel's behalf to secure such a placement for her.  Subsequently it agreed to fund Rachel's placement at TALK.

Additionally, Mrs. Hoff's statement has no factual or contextual support.  She admitted on cross-examination that Rachel typically used one word phrases.  N.T. at 929.  She told Dr. Bloomfield that Rachel was the least verbal child in her class.  P-23-5.  At the end of Rachel's Kindergarten year Ms. Hoff reported that "Rachel requires many verbal cues to initiate and subsequently engage in conversation.  At times she will spontaneously speak, but if it is not heard, she requires many verbal prompts to repeat herself."  P-26 at 3.  Rachel's IEP for First Grade contains a speech and language goal that Rachel will "spontaneously produce a 3-4 word simple sentences."  SD-9 at 20.  This is the same goal set forth on Rachel's Kindergarten IEP.  P-20 at 8.  Such a goal would have been nonsensical if Rachel could spontaneously produce whole sentences and paragraphs as Mrs. Hoff claimed.  N.T. at 1001.  Indeed, Rachel did not meet any of her IEP goals while she was in Mrs. Hoff's classroom.  P-26.

[12]     The Hearing Officer was incorrect when she said that Rachel's parents provided private therapy for her for a period of two months.  They paid for private speech and language therapy for *two years*.  P-17; P-38.

language needs and to address the appropriateness of her IEP . P-21.  The District

hired Dr. Nancy Bloomfield, a well-regarded certified school psychologist, to conduct

the independent evaluation and to make recommendations regarding Rachel's special

education program.  P - 23.  In connection with the evaluation, the Chester County

Intermediate Unit provided additional speech and language assessments.  P-27.

Soon after the school year began, Dr. Bloomfield advised the District that

Rachel needed an intensive, full-time language development program.  P-23 at 6-7.

Among other things, Dr. Bloomfield reported to the District that Rachel needed "daily

therapy to improve her articulation and a coordinated developmental language

program.  Language skills need to be introduced individually and reinforced during

group instruction."  *Id.*

By January, the District had done nothing to implement Dr. Bloomfield's

recommendations.  Dr. Bloomfield pursued the issue with Marge Yoder, the District's

Assistant Director of Student Support Services.  Ms. Yoder told Dr. Bloomfield that

there was no full-time speech and language program in Chester County.  P-29 at 1.  Dr.

Bloomfield recommended that the School District investigate the full-time program

sponsored by the Delaware County Intermediate Unit (DCIU).  *Id.*  P-29; N.T. at 679.

Later that month, the District finally agreed to increase Rachel's speech services

from 90 to 150 minutes per week.  Complaint and Answer at ¶52; N.T. at 948; 1594-95.

On Rachel's behalf the District applied for her to attend the intensive speech and

language program in Delaware County.  Unfortunately, Rachel was not accepted.  N.T.

at 681; 1657.  At the behest of experts, Rachel's parents started their own investigation

into programs that might help Rachel remediate her speech and language disabilities.

Among other things, they consulted TALK.  Rachel was not developmentally ready for

TALK at that time, but she was too high functioning for other programs her parents consulted.  HO-FF No. 64-65; P-25 ;  N.T. at 194; 685.

Rachel's speech and language skills at the conclusion of her Kindergarten year were very similar to the ones she had when she started. P-26; P-48.   Indeed, the District's speech therapist spent approximately eight months on the "f" sound, to the exclusion of other important speech and language objectives set forth on Rachel's  IEP. P-20 at 15; P-36; SD-9; N.T. at 1554. [13]  Likewise, she made very little academic progress, particularly in her special education classroom.[14]

### b.    First Grade

In the fall of 2005, Rachel began first grade in a blended life skills program at West Bradford Elementary School with inclusion into a first grade homeroom. Complaint and Answer at ¶55; HO FF No. 11.   Rachel's parents, who had always been committed to keeping Rachel in the least restrictive environment if at all possible, were frustrated by the District's proffer of essentially the same IEP for 1st Grade that it had for Kindergarten.  P-42; N.T. at 786.  Like the previous year, Rachel's first grade speech and language services were not sufficiently coordinated with her academic instruction, and the instruction itself was not adequately explicit, sequential, or repetitive to allow her to make meaningful progress.  P- 45 at 2-3.  By November,

_____

[13]   At the time Rachel had no front teeth and could not be expected to properly articulate the "f'sound.   N.T. at 643; 678; 1555.

[14]   According to the independent evaluation reports, Rachel seemed to do better in the regular classroom than she did in the special education classroom.  P-23; P-32; P-40. Her IEP's from Kindergarten and 1st Grade indicate that Rachel was working from year to year on the same IEP goals.  P-20; P-48; SD-9.

2005, Rachel had met none of her Kindergarten goals set forth on the January, 2005

IEP.   P-9;[15] SD-9at 5 and P-48.[16]

Rachel's deficits in speech and language not only were holding her back

academically but they were also interfering with her ability to interact with her peers.

She was experiencing social anxiety deriving from her inability to communicate and

this was having a detrimental impact on her emotional functioning and her overall

personality.   P-45.   Rachel was not benefitting from inclusion in a regular education

home room because the District denied her an aide to assist her to communicate with

her peers.   N.T. at 658; 663-67; 980.[17]   While she was physically present in the regular

education home room, Rachel was alone and isolated.   P- 45 at 1.

Because Rachel's intensive speech and language needs were impacting every aspect of

her social and academic development and time was of the essence, Rachel's parents

were advised by experts to search for other educational alternatives.   N.T. at 679; 752.

According to one expert, Rachel needed an intensive speech program "yesterday."   P-

45 at 3.

---

[15]   There is no support whatsoever for the Hearing Officer's statement that
Rachel's parents never visited her Kindergarten classroom.   HO FF 9 n. 4.   Mrs. Hoff
admitted that Rachel's parents were in the room frequently to pick Rachel up and to
drop her off.   N.T. at 946.   Moreover, they paid at least two professionals to conduct
observations of Mrs. Hoff's classroom, one by Dr. Levine, whom the Hearing Officer
describes as a "curriculum broker", P-45; and one by Dr. Nancy Bloomfield. P-29.
Mrs. Hoff admitted that Dr. Bloomfield got a good observation of Rachel and her skill
sets."   N.T. at 996.   Although the District claimed during the hearing to have been
offended by Dr. Levine's recommendations, (*see* HO FF No. 14 at n. 5), the District
agreed with the majority of them.   N.T. at 951; 1598.

[16]   For the most part, Rachel's goals and objectives from Kindergarten
remained the same for 1st Grade.   In some cases, they were even reduced.   *See e.g.*,
SD-9 at 16 and P-48 at 22.

[17]   Although Rachel's IEP called for a 1-1 aide when she attended her regular
education classroom, it is undisputed that the District did not provide the aide on a
consistent basis.   N.T. at 973-4.

Rachel's parents requested that TALK re-consider whether Rachel might benefit from its program.  After a one-week trial, TALK agreed to accept her.  Rachel's parents felt compelled to enroll Rachel there because TALK was specifically designed to aggressively remediate her apraxia and language-based learning disabilities, something experts had been emphasizing to them and to the District since early Kindergarten.  N.T. at 1658.  The school principal at West Bradford admitted that the District did not have such a program.  N.T. at 668.  *See also* P-29 at 1.  On November 1, 2005 Rachel's parents hand-delivered a letter to the District advising that they planned to enroll Rachel at the TALK Institute on November 15, 2005. P-47.  Rachel has attended TALK since then.  Complaint and Answer at ¶61; HO FF No. 66; 72; P-47.

Under a negotiated agreement, the District partially funded Rachel's tuition and related expenses at TALK for the 2005-2006 and 2006-2007 school years.    Pursuant to that Agreement, the District was obligated to pay for an independent evaluation both before and after the 2006-7 school year to assess Rachel's progress at TALK.  Rachel's parents understood that the District would continue to fund Rachel's placement at TALK if she had made progress there.[18]  The expert the District retained to test Rachel before and after the 2006-7 school year reported that Rachel had made enormous progress that year.  As set forth more fully below, the District ignored the findings of the independent evaluator.  P-65; P-66; P-67.  Contending that it was "disappointed"

---

[18]    The District's Assistant Director of Special Education acknowledged that if it was shown that Rachel was making significant progress we probably would have considered continuing our agreement.  N.T. at 1612.

with Rachel's progress at TALK, the District refused to fund any part of Rachel's

tuition for the 2007-8 school year.[19]

### 3.   Rachel's Program And Progress at TALK

The TALK Institute provides a full-day intensive speech and language

program for children with severe neurologically-based communication disorders and a

full academic curriculum including reading, writing, math, social studies and science.

In her program at TALK, Rachel receives her education in a classroom with

approximately four other students with language impairments similar to her own with

whom she can relate socially, form friendships, and practice her emerging

communication skills in a supervised setting designed to enhance her success and

encourage generalization of these new skills.  HO FF No. 40; N.T. at 1410.   The

program has an eleven month school year.   Most of Rachel's academic instruction at

TALK is delivered 1-1.  During the 2007-8 school year, Rachel received 1-1 speech

therapy five times per week for 30 minutes, and separately receives the language

therapy for 7 hours per week.  HO FF No. 49; P- 60.   She an extensive occupational

therapy program for 4 hours each week to address Rachel's sensory, relational, motor

planning, communication, and cognitive needs.  P-60 at 10;  N.T. at 366-68.

The program at TALK is highly integrated among all of its professional and

para-professional staff.  HO FF No. 47.  Academics are driven individually for each

child by the speech therapist based on the child's progress toward her speech and

language goals.  N.T. at 448;1269.  TALK uses a phonics-based, multi-sensory and

multi-level curriculum called the Association Method to teach oral and written

---

[19]   The District admitted at the hearing that according to the independent
evaluator, Rachel had made good progress at TALK.  *C.f.,* N.T. at 1612 and 1627-32.

communication.  HO FF No. 43; 44; 47.  The Association Method has been utilized

successfully over the course of 50 years to address neurologically-based language

disabilities.[20]  It is a unique system of structured and repetitive instruction which helps

the child's neurological system develop automaticity in language processing and use.

P-95 at 2.  The Association Method is driven by two fundamental principles.  First, it is

based on the motor theory of speech perception, i.e, vocal response provides motor and

acoustic feedback that will lead to understanding.[21]  Second, language is learned

through attention, retention, and recall, all of which must integrate or "associate" with

each other.  P-95 at 2.   Thus, the Association Method systematically introduces the

sounds of speech in a sequence tailored to each child's needs based on the sounds the

child is able to produce automatically with precise articulation.  HO FF No. 43; P-95 at

3; 5.  Each child's program is  designed individually by a speech and language

therapist who spends seven hours per week in the classroom.  HO FF No. 45; 49.   The

goal is to teach the child to attend, process, store, and retrieve spoken and written

language appropriately and automatically.  P-95 at 3.

Children in the first two levels of the Method use the "Northampton Symbols",

a phonics system in which the 44 sounds in the English language are reduced to single

symbols.   HO FF 46; P-95 at 5.  Mastered sounds form the basis of an individualized

---

[20]     As the Hearing Officer pointed out, the Association Method was
initially developed to work with veterans with traumatic brain injuries.  Eventually it
was adapted for use with hearing impaired children and then for children with other
severe neurologically-based speech and language impairments.  P-86; P-95 at 2; N.T. at
53; 562.  Thus, although the Association Method is not new, it is an effective process
for teaching communication, reading, and writing to language-disordered children.  P-
95 at 2.

[21]   One of the experts summed up the theory succinctly: "You have to have
captured it receptively in order to use it expressively".  N.T. at 1179.

reading and writing program that utilizes color coding to assist children with phonemic awareness.  HO FF 46; P-95 at 5.   Transition to regular print occurs at the third level of the Method at which time the child has mastered phonics skills enough to generalize them to the regular 26-character alphabet.  P-95 at 4; N.T. at 154; 158; 269.[22]

The Association Method uses cursive writing, rather than print, to address fine motor deficits and facilitate attention.  HO FF 46; N.T. at 89.   This helps the child maintain focus and attention by eliminating the need for the child to lift the hand to complete one letter and then re-orient themselves to begin the next.   This process can be very laborious for a child such as Rachel with significant motor planning deficits, and significantly interferes with acquisition of sound-letter correspondence which is the foundation of written expression.   P-95 at 5.  Sound mastery is achieved through "integral stimulation" which demands intensive sound practice involving thousands of repetitions per week until true sound mastery and automaticity are achieved.   HO FF No. 48; N.T. at 482-83.  This is the only methodology for the treatment of apraxia that has been recommended by the American Speech Hearing Association (ASHA).  N.T. at 482; 545; 1153.  The child's speech, reading, and writing goals are systematically integrated into multiple structured activities, such as calendar and journal, which are generalized across multiple activities and settings throughout the school day.  N.T. at 143; 387; 413; 489; 491; 498.

Because of the integration of speech therapy into all aspects of the TALK program, there is virtually no time during the day when Rachel is not receiving either academic instruction, therapeutic intervention.  Even snack, lunch,  and free time have a pedagogic component.  N.T. at 125; 149; 1324; 1415.

---

[22]   By January, 2008, Rachel was beginning to read words in regular print, not just those formatted with the Northampton Symbols.

The intensive speech and language program Rachel receives at TALK has been effective to address her individual needs across the board. P-89 at 2-3. Indeed, although the District claimed that it refused to continue Rachel's funding at TALK because she had made little or no progress there, its witnesses were forced to admit on cross-examination that Rachel *did* make progress at TALK in all academic areas well as as speech,[23] language,[24] socialization,[25] and adaptive functioning.[26] The District's own independent neuropsychological evaluator, Dr. Kristen Herzel told the District prior to the 2007-8 school year that Rachel had made meaningful progress in *every domain* at TALK. P-65; 67. Dr. Herzel's July, 2007 report to the DASD indicated that during the 2006-7 school year (nine months) Rachel made a full year of progress in Math, four months of progress in reading, and three months of progress in spelling. P-

---

[23] When Rachel first came to TALK, she was almost unintelligible with severe to profound articulation deficits. N.T. at 206. By the end of the 2006-7 school year, her articulation was much better and she was starting to learn to monitor and self-correct her speech. N.T. at 492; 1133; 1139. When she started TALK's program, she could articulate 25 out of the 44 Northampton sounds. N.T. at 83; 586. At the conclusion of the 2006-07 school year, Rachel could articulate 34 of them without cues. In isolation she could imitate 39 of the Northampton sounds. N.T. at 581.

[24] When she started at TALK, Rachel was reticent to use her speech. P-105 at 5; N.T. at 205; 474; 929. Due to her anxiety, she used a very soft voice which was hard to hear. N.T. at 205; 479. By the end of the 2006-7 school year, Rachel was using a loud voice for more effective communication. N.T. at 254; P-105 at 1; 5-8. The length of her responses as well as her spontaneous utterances had increased dramatically. N.T. at 273; 929; 727-28. According to the District's independent evaluator, during the 2006-07 school year alone, Rachel's made a full year of progress in language comprehension. P-66-67.

[25] When Rachel first came to talk, her interaction with peers had to be completely facilitated. N.T. at 275-6; 667; 930; 980. By the time she completed the 2006-7 school year, Rachel initiated conversations with peers on her own. N.T. at 275-6; 426. Likewise, she consistently responded to peers who initiated conversations with her. N.T. at 425; 715. In September, 2006, Rachel's tested social communication was at the 3.6 age level. By June, 2007, her tested social communication age-equivalent was 6.7. P-65 at 3.

[26] *See* P- 83 at 10; 13; N.T. at 1306; 1458.

65 at 1; 2.  Dr. Herzel further found that during the 2006-7 school year Rachel made one year and seven months growth in adaptive functioning.  P-65 at 2.  The District admits that Rachel's progress during the 2006-07 school year was consistent with or greater than that which could have been expected in light of Rachel's  potential.  P-89 at 2; N.T. at 1623-24; 1627; 1631-32.

Most importantly, in the area of speech and language, Rachel made enormous gains.  According to Dr. Herzel's testing, between September, 2006 through June 2007 Rachel went from a 3.6 age equivalent in the area of social/communication to 6.7.  She went from a 5.3 age equivalent in language comprehension to a 6.3.  Likewise, in Language Expression she went from a 1.10 age equivalent to 5.8.  P- 58 at 11; P-65 at 3.  In stark contrast to her communicative abilities when she first came to TALK, by the end of the 2006-7 school year Rachel had mastered dozens of articulation goals and developed the pragmatic skills to navigate basic social functions at home, school, and in her community which had been far beyond her when she first entered the program.  P-105.   Whereas Rachel was capable of just 2-4 word utterances when she came to TALK, by the time she had completed the 2006-7 school year she was able to speak in sentences as long as fourteen words. N.T. at 274.

In Reading, Rachel has made meaningful progress as well.  She has acquired the ability, for the first time, to sound out dozens of letter combinations and to read hundreds of words to which she had never formally been introduced.  By the end of the 2006-7 school year Rachel had learned to read at least 300 sound combinations and was learning to generalize her skills.  P-64.  Likewise, in Math, Dr. Herzel found that Rachel made a full year of progress.  P-65 at 2.  This is in spite of the difficulties

Rachel has in Math due to its inherently abstract nature.  N.T. at 248; 705; 1100.[27]  In writing Rachel made great strides as well.  Rachel could not write when she first came to TALK.  N.T. at 201; 250.  She could not stay on a line and needed hand-over-hand support for tracing.  N.T. at 204; 631; SD-10 at 21.  By the end of the 2006-7 school year Rachel could copy independently and could write her own sentences.  N.T. at 244; 383; 420; 627; 630.[28]

The District admits that Dr. Herzel is well-regarded in her profession and that it had no basis for disagreement with her findings.  N.T. at 1612.  Furthermore, the District admits that it could not have expected Rachel to make any more progress during the 2006-7 school year than she did.  N.T. at 1631-32.  As set forth more fully below, however, the District ignored Dr. Herzel's findings and supported its decision not to continue Rachel's placement for TALK on the false representation that Rachel had not made progress there.[29]

---

[27]   When Rachel came to TALK she could not write or trace numbers. N.T. at 250.  By the end of the 2006-7 school year, she could write numbers independently without a visual cue from 1-30.  N.T. at 420.  Rachel did not understand 1-1 correspondence when she first came to TALK.  N.T. at 1004. By the end of the 2007-8 school year, Rachel had this skill.  N.T. 420

[28]   A cursory review of Rachel's work product demonstrates her increased àcquisition of academic skills during the time she was at TALK.  P-94.  *See also* 1341-42 (parents' expert's discussion as to how Rachel's progress can be ascertained through curriculum-based assessment).

[29]   The District's counsel falsely claimed during her opening statement, Dr. Herzel reported that Rachel made little to no progress and questioned the appropriateness of the program at TALK.  According to counsel, "You'll be hearing from that independent psychologist."  N.T. at 31.  Not surprisingly, because Dr. Herzel's reports said just the opposite, the District never called her as a witness.

### 4.   Dispute Between The Parties During The 2007-8 School Year

### a.      Procedural Issues

After Dr. Herzel issued her report in July, 2007, Rachel's parents scheduled a meeting with the District to discuss it.  P-68.  Based on their prior understanding, it was their expectation that the progress Dr. Herzel identified on her report would result in the District's agreement to fund Rachel's placement at TALK for the 2007-8 school year.  Prior to the IEP meeting Rachel's parents had cooperated in the District's re-evaluation and provided the District with all of Rachel's records from TALK. Complaint and Answer at ¶85.  Among these records was the IEP which TALK had constructed for Rachel in February, 2007.  P- 60.

Rachel's parents participated in a 2-3 hour IEP meeting on August 20, 2007. Complaint and Answer at ¶ 95.   The District came to the meeting with a Notice of Recommended Placement (NOREP) which had been signed that day by the Superintendent and which purported to place Rachel in the District's life skills program at West Bradford Elementary School.  This was premised on  a "draft" IEP which the District had developed without consultation with Rachel's parents.  Complaint and Answer at ¶101; P-50; P-71.  Pursuant to the NOREP, the District unilaterally rejected TALK as a possible placement prior to the IEP meeting.[30]

### b.      The Substance of the Respective IEPs

The District's draft IEP incorporated some of the goals and objectives set forth on TALK's IEP.  Overall, however, the District's IEP contained a water-downed

---

[30]   The NOREP indicates that the District considered placing Rachel at "Magnolia" but had rejected that option because it was too restrictive.  P-72 at 1.

academic curriculum premised on the assumption that Rachel is moderately to severly mentally retarded and not capable of functioning independently as an adult.[31]  Most fundamentally, however, the District's speech and language program was substantively inferior and therapeutically insufficient to address Rachel's needs.  It did not contain a system pursuant to which Rachel could realistically meet her speech and language goals nor did it provide for the type of staff coordination she required to make meaningful academic progress.  N.T. at 1333;1359;1363;1418 (no system for phonemic awareness; the system is for sight reading.)

Rachel's parents expressed their concerns about the lack of intensity of the District's proposed programs.  They wanted more intensive speech and language program.  N.T. at 758.  Likewise, they wanted the District to incorporate elements of the Association Method into Rachel's program so that she could continue to develop as a phonetic reader.  The District agreed to add cursive to the IEP, and made some other changes to Rachel's academic goals, but refused to increase Rachel's speech and language services or incorporate any other aspects of the Association Method.  Likewise, the District refused to consider TALK as a potential placement.

Accordingly, on August 31, 2007 Rachel's parents advised the District that they had decided to continue Rachel's placement at TALK for the 2007-2008 school year.  Complaint and Answer at ¶103; P-73 at 2.   They provided the District with

---

[31]   Ms. Hoff's testimony on this point is telling: She did not believe in providing aides for children such as Rachel because she "believe[d] they're going to be trailed the rest of their lives practically with somebody needing to help, so I would rather have them be as independent as possible while they're young."  N.T. at 938. There is no basis for her conclusion that Rachel will need to be "trailed" all her life if she learns effective communication skills.  A program premised on Rachel's tested I.Q., however, rather than her functional achievements and her potential for growth, would most likely leave Rachel without the skills she will need to live independently. This is precisely the reason that her parents moved her from the District's life skills program to TALK.  N.T. at 674; 1658.

written notice of their decision, along with their intent to seek reimbursement for the cost of tuition and related expenses, in accordance with the requirements of the IDEA. P-74 at 1.

### 1.   Speech and Language

The most critical element of Rachel's education from her parents' perspective is her speech and language program.  Without adequate speech and language skills, Rachel not only will not advance academically but she will never be able to communicate well enough to be an independent and functional adult.[32]  N.T. at 1143; 1161; 1466.  This is the precise reason they placed her at TALK in the first place. N.T. at 674; 1658.

The District's 2007 IEP proposed only 120 minutes of speech and language therapy per week.  P-72 at 34; N.T. at 526.  This was reduced from the 150 minutes per week Rachel had been receiving in the District before she went to TALK.  P- 34 at 1; N.T. at 699; 1171.  Under the District's proposal, none of Rachel's speech services would have been delivered 1-1.  She would have received speech in a group consisting of her entire life skills class. P- 72 at 34; N.T. at 868; 1551.

By contrast, at TALK Rachel was to receive 2.5 hours of individual speech and language therapy per week.  P- 60; N.T. at 365. She was also to receive 7.0 additional hours of speech in the classroom.  N.T. at 368; 488.[33]

---

[32]   Rachel's speech and language impairments impact her ability to make meaningful progress in Math.  N.T. at 248; Likewise, Rachel's social skills are directly tied to her competence in speech and language.  N.T. at 424; 1142-43.

[33]   The Hearing Officer's conclusion that Rachel's speech needs could be met in a classroom  without the regular presence of a speech and language pathologist is not supported by the record.  HO FF No. 17.  This finding is premised, at least in part, on the notion that the classroom teacher had daily consult time with the speech

Compared to most students with speech and language impairments, Rachel needs a very high level of speech and language therapy to make progress.  N.T. at 1144.  She needs 3-5 individual sessions per week just to deal with her apraxia and articulation issues.  N.T. at 1143; 1256; 1275-77.  She has many other issues which need to be aggressively addressed in therapy, including linguistic memory and language formulation.  N.T. at 1256.  This therapy must be delivered 1-1 because due to her apraxia, she needs a lot  of drill and repetition, i.e.  a "hard hit" in articulation in order to get it to generalize.  N.T. at 1143; 1257; 1275; 1281.  Moreover, group speech is not appropriate for Rachel due to her attention and memory deficits.  N.T. at 1143.

The level of speech and language support proposed by the District would not have enabled Rachel to make meaningful progress toward independent speech and language skills.  N.T. at 1167-68.  Rachel's speech and language deficiencies are severe and complex, involving, *inter alia,* HPE and its attendant neurological and cognitive impact, the abnormalities in her speech structures, her apraxia and her attentional issues.

Due to Rachel's apraxia and the severity of her language needs, she needs an academic program driven  by a speech therapist in order to make progress.  N.T. at 492; 1265.   The speech and language goals contained on the District's IEP (not to mention the numerous other goals set forth on TALK's IEP), could not have been met with a program of 120 minutes per week of group speech.  N.T. at 532.  Indeed, the District admits that ASHA recommends that a child with apraxia should receive three to five individualized sessions per week of thirty minutes each.  N.T. at 1550.  The

and language therapist.  The IEP provides, however, for a maximum of 30 minutes of consultation time *per month*.  P-72 at 34;  N.T. at 1168; 1184.

District's draft IEP provides for *no* individualized therapy.  N.T. at 1550.  Moreover, analyzing Rachel's language errors is difficult and complex.  N.T. at 1115; 1130.  They can involve errors in word retrieval, grammar, language formulation, or working memory.  N.T. at 1151.  The type of intervention Rachel needs cannot be provided by a classroom teacher without the overriding presence of a speech and language therapist. N.T. at 492; 1204; 1265; 1275.  TALK's program provides for the speech and language therapist to be in the classroom 7.0 hours per week working directly with the teacher. The District's IEP, by comparison,  provides for a *maximum* of *thirty minutes* of consultation between the teacher and the speech and language therapist *per month*.  P-72 at 34; N.T. at 1552.

## 2.       Reading and Writing

Rachel's reading program as set forth on TALK's IEP was far more ambitious than the one identified on the District's draft IEP.  Strikingly, in spite of how fundamental reading will be to Rachel if she is ever to become an independent adult, under the District's proposal Rachel would have received Reading just twice a week. N.T. at 918.  TALK's reading program, by contrast, called for daily instruction.  N.T. at 60 at 39.  While there are some surface similarities as to a few of the specific goals and objectives on the respective IEP's, there are many important differences in content and scope between the District's proposed reading program for Rachel and that set forth on TALK's IEP.  For instance, both IEP's contained goals centered on listening

comprehension.[34]  *C.f.,* P- 60 at 20 and P- 72 at 23.  Indeed, it appears that the District

adopted these goals from TALK's IEP.  That is where the similarity ends, however.

   The District's reading program for Rachel was based on a sight word

recognition.  It proposed to utilize the Edmark reading program, which is a system for

learning sight words, but not for building phonemic awareness.  N.T. at 1359.  The

theory underpinning the program is that phonemic awareness "will emerge" from

learning words by sight.  N.T. at 894.  The District proposed that Rachel would learn

fifty new sight words during the 2007-08 school year with "opportunities for phonemic

awareness."  There is no description as to how those opportunities would be provided.

P-72 at 22; 33; N.T. at 1357-60.  The District's IEP provided no specifically designed

instruction directed toward the systematic instruction of phonics.

   Rachel's reading program at TALK incorporates the Association Method and

focuses on the systematic instruction of phonemic awareness.  H.O. FF No. 54; N.T. at

824; 894-5; 1359.  The TALK IEP proposed to teach Rachel to sound out 50 nouns,

while at the same time teaching her to articulate and trace them.  Unlike the District's

IEP, TALK's IEP contained reading goals related to identifying and matching similar

word configurations and identifying familiar words with long and short vowels.  It

contained a plethora of Association Method goals directed toward developing Rachel's

ability to read and write, all of which were missing from the District's IEP.  At TALK

she would have received instruction directed toward reading and blending nouns and

nonsense syllables.  She would have matched primary and secondary spellings of

---

[34]  The District's IEP proposed to teach Rachel to respond to "wh"
questions, including what, where, why, and when.  TALK's IEP focuses more generally
on content questions, and also contemplates instruction related to answering true/false
questions.

sounds, and learned to use articles, such as "a," "an", "some". TALK's IEP would have required Rachel to categorize nouns according to questions involving "who?," "what?," "how many?", and by color. She would have been learning to use language by answering questions orally *and in writing* in response to questions such as "what do you see?", "what is this", "who is this", and "who's is this?". The District proposed no writing goals.

### 3.   Math

The District adopted the first six Math goals set forth on the TALK IEP. Generally, both IEP's included counting sets of 1-20, using simple addition to ten, and telling time to the hour. TALK's IEP, included additional goals related to time.[35] It also contained Math goals related to copying numerals from 1-10, naming numerals upon demand from 6-10, using a number line, counting by rote to 100, counting by 5's to 50, and using simple subtraction to 5. Pursuant to the District's proposed IEP Rachel would have had Math instruction just twice a week in 30-45 minute sessions. *C.f.,* N.T. at 121; 377; 1398 and N.T. 892. At Talk, she would have received daily math instruction.

### 4.   Social Studies and Science

The Life Skills program in the District had no formal social studies or science curriculum. N.T. at 904. Both the District's draft IEP and TALK's IEP contained Social Studies goals related to the value of coins. TALK's program, however, would have supplemented these goals with its PDE-approved social studies

---

[35]   Under the TALK IEP, Rachel would be instructed on telling time to the half-hour (as well as the hour), identifying a.m. and p.m. in her daily activities, and identifying noon and midnight.

curriculum which extends over half the school year.  N.T. at 54; 150; 423.[36]  Likewise, TALK's IEP provided a PDE-approved half-year Science curriculum.

**ARGUMENT**

The Hearing Officer decision accepting the adequacy of the District's proposed program and placement is clearly erroneous and should be reversed in accordance with this Court's authority under the judicial review provision of the IDEA, 20 U.S.C. § 1415(I)(2).  The Decision ignores massive portions of the documentary record.  Moreover, it confuses evidence the District proffered at the hearing regarding what it knew or alleges it knew *after* it made its placement decision with what it knew or should have known *at the time* it made its decision in August, 2007.

Fundamentally, many of the Hearing Officer's findings are premised upon general principles but are divorced from the factual complexity of Rachel's disability. It is surprising at the very least that the Hearing Officer did not make a single finding describing Rachel's apraxia and how it relates to her educational needs.  There is a plethora of evidence in the record as to how Rachel's speech and language transcend her ability to communicate but impact upon almost every other aspect of her life.  No one knows the extent to which Rachel will eventually be able to live an independent life.  The record is replete, however,  with evidence which strongly refutes the notion that Rachel is a child with mental retardation who will never be able to live on her own. The Hearing Officer assumed that Rachel's "levels" in the range of mental retardation provided an adequate basis for her educational program.  HO FF No. 35.  Rachel is brain-damaged, to be sure, and has pervasive educational needs, but the record clearly

---

[36]    TALK's IEP also contained specific goals related to using maps.  P-60 at 22.

shows that adaptively she functions far higher than she would as a child with

retardation.  Although standardized tests may not show how much she has grown from

an academic standpoint, there can be no dispute that her adaptive growth has exceeded

all expectations based on her cognitive "on-paper" profile, and that she continues to

make progress toward age-appropriate functional skills as she improves her ability to

communicate.  The fundamental problem underlaying the Hearing Officer's ratification

of the District's IEP, that Rachel is only entitled to a basic floor of opportunity, is

problematic because FAPE requires that she be provided a program which allows her to

made progress in accordance with her potential.  *See e.g., D.S. v. Bayonne Board of*

*Educ.,* 602 F. 3d 553 (3rd Cir. 2010); *Polk, supra,* 853 F.2d at 185; *Ridgewood Bd. of*

*Educ. v. NE,* 172 F.3d 238 (3d Cir.1999); *Alex v. Forrestville Valley Comm. United*

*Sch. Dist.,* 375 F.3d 603, *cert. denied,* 543 U.S. 1009 (2004).

Rachel's potential is still something of a question mark, but it is quite certain

that it is closer to that of a typical child than one with mental retardation.  N.T. at 1109;

1131; 1158; 1340.  All her life Rachel's potential has been masked by her speech and

language disabilities which interfere with her ability to tell people what she knows.  *See*

*e.g.,* P-89; N.T. at 1180.  The Hearing Officer failed to recognize that the District's

program was based on an artificially low estimate of her potential and threatens to

confine Rachel in the cloak of her disability for the rest of her life by denying her the

aggressive speech and language services she needs to emerge from it and take her place

in the world as an independent adult.  Where as here, a child is struggling with a

disability which interferes so profoundly with the acquisition of a skill like the ability

to communicate, which is so fundamental to her eventual ability to achieve

independence, FAPE requires that her program be driven by the therapeutic services

she needs to break through the barriers that are holding her back.  Providing Rachel

with a program which will help her talk a little better is simply not enough when there

is real hope that she might one day talk well enough to master her own fate.[37]

### A. THE HEARING OFFICER'S CONCLUSION THAT THE DISTRICT'S IEP OFFERED A PROGRAM EQUIVALENT TO THAT OFFERED BY TALK IS NOT SUPPORTED BY THE RECORD

Tellingly, the Hearing Officer's Decision regarding the appropriateness of

the District's IEP for the 2007-8 school year, other than her recitation of boiler plate

legal propositions, is four sentences long.  Decision at 17.  The record in this case

contains a transcript of nearly 1700 pages and more than a hundred exhibits.  That the

Hearing Officer could dispose of the complex FAPE issues in this case in such a

perfunctory manner, frankly, is shocking.

Although no one disagrees that from a technical standpoint, that the

District's IEP "contained all the elements required by the IDEA,"[38] FAPE is far more

complex than the Hearing Officer suggests. Far from being a formulaic concept, a

---

[37]   The IDEA was amended in 1997 and again in 2004 to make it clearer that    Congress expected children with disabilties to enjoy more than just access to public education, but the opportunity to achieve independence in accordance with their potential.  "Students with disabilities, more so than their peers, need an education plan that takes into account their academic needs, but also their life goals.  Because for children with disabilities, success means more than learning the three R's, it means being able to live independently after they leave school and to contribute and be a part of their community."  Sen. Report at 11544.  *See also Polk v. Central Columbia Sch. Dist.,* 853 F.2d 171, 181-2 (3d Cir. 1989), *cert. denied,* 488 U.S. 1030 (1988).

[38]   The elements to which the Hearing Officer was referring are set forth on Page 16 of her Decision as follows:  statement of the child's present levels of educational performance, a statement of measurable annual goals related to the child's disability-related needs, a statement of the special education and related services the child will receive, a statement of the modifications or supports for school personnel that will be provided for the child, and the extent to which the child will be educated with students who do not have disabilities.

-31-

district must provide an individualized program which is calculated, when the program is offered, to meet all of the child's needs.  Rachel's needs are complicated by her very rare constellation of neurological deficits and her overriding speech and language disorders.  The Hearing Officer gives short shrift to the hundreds of pages of testimony and other documents in the record which clearly indicate that the District's IEP was not designed to meet Rachel's unique needs, however well it might have met the needs of other students in the District.

The Hearing Officer's Findings of Fact, while certainly more detailed than the explanation she provided about their meaning, is premised on the notion that the District's proposed IEP for the 207-08 school year was almost "identical" to the TALK IEP.  She viewed the dispute in this case as a battle over methodology, and nothing more, contending that Rachel's parents were seeking a program that would maximize Rachel's potential rather than the basic floor of opportunity to which she was entitled.  As set forth more fully below, all of the basic underpinnings of the Hearing Officer's decision are erroneous both legally and factually.

### 1.   The District's IEP Is Not Identical To Or Even Close To the Program Proffered by TALK

It is clearly not the case that the District's IEP is identical or even similar to the program at TALK.  *C.f,* HO FF No. 13.  A side-by-side analysis of the two IEP's should dispense with that assumption.[39]  On its face, TALK's IEP is far more detailed, particularly in the areas of speech, language, and reading.  These are the primary areas in which Rachel needs to make progress in order to have any hope of achieving independence.  Although the District adopted a few of the TALK goals, particularly in

---

[39]   A side-by-side analysis of the District's IEP for the 2007-08 school year and TALK's February 2007 IEP is attached to this Memorandum as an appendix.

listening comprehension and math, the District's program is far less detailed and provides inadequate levels of instruction, therapeutic intervention or coordination, to be effective.

Additionally, the District's program would have provided Rachel with far less instructional time than did TALK's IEP.  Under the proposed District IEP, Rachel would have spent over eighty minutes per school day transitioning between activities or locations within the school building.  This amounts to more than one entire school day per week.  This is in addition to the non-instructional time Rachel would have spent in activities such as lunch and recess.  Rachel is too far behind to spend so much time on activities not directed toward specific learning.  P-45 at 2; N.T. at 1365; 1414.

a.   **Speech and Language:**  The Hearing Officer erroneously concluded that the District's IEP was appropriate when it clearly lacked the requisite intensity in the area of speech and language, which is at the core of Rachel's learning disabilities.[40] The speech and language program the District proposed to provide Rachel, who has a severe, neurologically based speech and language disorder, contains just 120 minutes per week of speech therapy.  By contrast, Rachel gets 150 minutes of individualized speech and language therapy at TALK.  HO FF No. 49; N.T. at 486.   Additionally, at TALK the speech therapist spends an additional 7.0 hours per week in Rachel's classroom during language arts instruction and related activities to assist her to generalize what she learns in the therapy setting into the classroom.  N.T. at  117; 130;

---

[40]   *See e.g., Ridgewood Board of Education v. N.E.,* 172 F.3d 238, 245 (3rd Cir.   1999)(tuition reimbursement granted because at Landmark child would be able to develop at least average reading and writing skills so as to become a functional adult).

368; 551.[41]  In the District's program, the speech therapist spends just one half hour per week in the classroom.  N.T. at 868-69.

The District admitted that for a child with apraxia,  ASHA recommends three to five half-hour sessions per week of speech therapy in a 1-1 setting to address speech and articulation.  For Rachel, who has significant speech and language needs well beyond those created by her apraxia, the District offered just three sessions per week with *not one minute* of individualized therapy.  N.T. at 868; 1551.[42]  There can be no question that the speech and language the District offered to Rachel in this core area of deficit is not similar, much less identical, to the one she was receiving at TALK.  It did not even meet the standards the District itself admits it was required by professional standards to satisfy.  N.T. at 1256.

Additionally, the fact that the District borrowed goals from TALK's IEP does not mean that it was offering the same speech and language program.  For instance, the District adopted TALK's sound discrimination goals.   However, it omitted TALK's goals for sound production.  N.T. at 517.  TALK's overriding goal was to help Rachel translate her sound discrimination skills into functional speech. N.T. at 518-19.   This was missing from the District's proposal.  At TALK, Rachel would have been required to articulate the targeted sounds in the initial, medial, and

---

[41]   The Hearing Officer made a finding that students with speech and language impairments generally (not Rachel specifically) need their language skill development to be embedded into the classroom.  HO FF No. 17.   Only TALK, not the District, set forth a plan to make that happen for Rachel.

[42]   The Hearing Officer's conclusion that the District's proposed speech therapy time would have been delivered individually and in groups has no support in the record.  HO FF No. 15.  Indeed, the District's own speech therapy conceded that if the services were to be delivered 1-1, the IEP would have said so specifically.  N.T. at 1551.  It did not.  *Id;* P-72.

final positions and then move those sounds from words to phrases and then sentences in conversational language.  N.T. at 519; P-60 at 18;19.[43]  Pursuant to the District' IEP, Rachel would have completed the 2007-08 school year without being able to use any new sounds in conversation.

In addition, the Hearing Officer made no distinction between the amount of therapy Rachel needed to make progress toward her speech goals as distinct from her language goals.  N.T. at 1257.  It would be impossible for Rachel to meet the speech goals set forth on the District's IEP as well as her language goals, which are equally important, given the time the District allotted for speech therapy.  N.T. at 532.  Due to her severe speech and language needs, Rachel needs a speech therapist in the classroom while working on language goals, language instruction, and language arts.  N.T. at 492.  Like other skills, Rachel needs intensive and direct instruction in order to generalize the skills she is learning in therapy into her classroom.  N.T. at 498.  Moreover, she requires far more collaboration between the speech and language therapists and her teacher in order to make adequate progress in speech and language.  The District's IEP called for a *maximum* of *thirty minutes* per month for coordination and collaboration between the speech therapist and Rachel's teacher.

For Rachel, the minimal amount of speech therapy and the paucity of speech goals the District planned to address rendered the speech component of the District's IEP inappropriate.  Rachel's ability to acquire speech and language skills is central to her ability to acquire other academic skills, and is fundamental to her ability to become

---

[43]  This is just one example of how the District pulled goals from the TALK IEP without having any idea how to provide context for them.  TALK's goals for Rachel were specifically designed according to where she was in the Association Method.  N.T. at 525.

a functional adult.  The District's IEP set an unreasonably low bar for Rachel's speech and language progress during 2007-08 based on her demonstrated progress at TALK and her evident potential to continue making progress toward age-appropriate speech. Indeed, although the Hearing Officer stated that the District developed Rachel's IEP based on TALK's evaluation data, Rachel's speech therapist at TALK testified that the District's goals based on that data were far too limited.  N.T. at 532.   Moreover, the modicum of speech therapy Rachel would have received in the District would have been entirely inadequate to allow her to make progress toward even the meager speech and language goals set forth on the District's IEP, much less the more expansive goals on TALK's IEP.  N.T. at 532; 1168.  At TALK, however, Rachel met the two speech goals set forth on the District's IEP by November.  N.T. at 521.  She received more advanced speech goals on her February, 2007 IEP at TALK, and went on to meet forty of them by the end of the year.  P-69; 105.

### b.  Reading

There can be no dispute that the District's reading program was not calculated to allow Rachel to make adequate progress in this fundamental skill according to her needs and her demonstrated potential.  Far more than a dispute over methodology is at issue here.

First, the District's IEP set minimal expectations for Rachel in the area of reading based on an artificially low estimate of her potential and on the assumption that Rachel will never be an independent reader.[44]  This is illustrated most dramatically by

---

[44] According to the Hearing Officer, all of the students who would have been in Rachel's class during the 2007-08 school year were on Rachel's reading level.  To the contrary, the record indicates that the students are all using the Edmark reading program, but that they are on different reading levels.  N.T. at 827.

the fact that she would have received reading instruction just two to three times per week for a total of 60-90 minutes.  N.T. at 919.  Indeed, typical children, who are expected to make one year's worth of progress in reading during each school year, have reading every day.  It is impossible to expect that Rachel, who has severe neurological disabilities, could possibly make adequate progress in Reading with such minimal exposure to the curriculum.[45]

Second, the District's proposed reading program for Rachel was premised on sight word recognition.  N.T. at 824; 894; 1355.  Indeed, the District's IEP contained no goals designed to develop Rachel's lifelong capacity to decode unfamiliar words. N.T. at 701; 1353; 1359.   The District adopted a sight word approach for Rachel rather than a structured phonetic method without ever having assessed Rachel's ability to associate letters with sounds.  Because she did not know the names of the letters, the District assumed that she did not have the skills to use a phonics-based program.   N.T. at 1648; 1070.  As the Hearing Officer pointed out, however, Rachel knows how to associate letters with the sounds they make and this is far more important.  N.T. at 1071 The District claimed that phonemic awareness will "emerge" from sight word recognition.  N.T. at 894.  Whether or not this might be true for some students with disabilities, the record is clear that Rachel does not learn phonemic awareness or any other academic skill without specific, explicit, and systematic instruction. N.T. at 1357- 50.[46]  The Hearing Officer herself recognized this.  H.O. FF No. 7.   Undisputed expert

---

[45]   In fact, she would have received reading and her other academic instruction less frequently than twice a week since she would have been pulled from her classroom for four therapy sessions per week during her academic blocks.  N.T. at 874.

[46]   *See e.g.,* HO FF NO. 62, in which the Hearing Officer recognized that Rachel's standardized test scores since 2005 have remained relatively "static" *except in areas in which she has really been trained.*

testimony establishes that in order to be effective, Rachel's instruction needs to be systematic, layered, and repetitive.[47]  She is very dependent on consistency and format of delivery.  N.T. at 1368.

Third, Rachel has learned to use phonemic cueing to self-accommodate and to demonstrate what she knows academically.  N.T. at 1112.  Indeed, the experts who tested Rachel all noted how often she could correct an incorrect response when provided with a phonemic cue.  Those corrected responses could not be counted pursuant to testing protocols, but they clearly indicated that Rachel knew far more than her test results gave her credit for.  N.T. at 1113-4; 1319; 1407.

It is impossible to devise an appropriate IEP for a child such as Rachel, who is clearly making progress toward independent literacy and to cope with her academic

---

[47]   The District claimed during the due process hearing that in addition to Edmark, it might also use Project Read, a system designed to address phonemic awareness.  HO FF No. 21.  There is no dispute, however, that the only person the District claims to have trained on Project Read was Mrs. Hoff, Rachel's Kindergarten and First Grade teacher.  The training took place after Rachel left the District to attend TALK.  N.T. at 1685.  Moreover, there is no dispute that Mrs. Hoff would not have been Rachel's teacher during the 2007-08 school year. N.T. at 971.

It was inappropriate for the Hearing Officer to rely on the testimony regarding Project Read to bolster the District's assertion that it offered FAPE to Rachel when it was not identified on her IEP, and there was no evidence that it ever told Rachel's parents that it might use it to address Rachel's need for phonemic awareness.  P- 72 at ; N.T. at 1688.  *Carlisle Area School v. Scott P.,* 62 F.3d 520, 530 (3rd Cir. 1995)(measure and adequacy of an IEP can only be determined as of the time it is offered, not at some later date); *Rose v. Chester County IU,* 1996 U.S. Dist. LEXIS 6105 (E.D. Pa. 1996)(tuition reimbursement was improperly denied based on the IEP as modified by the Hearing Officer, not as it was offered to the parent).  *See also Dumont Bd. Of Educ. v. J.T.,* 54 IDELR 231 (D.N.J. 2010)(adequacy of IEP is judged based on what it actually offers, not on what services a district might offer later); *accord T.H. v. District of Columbia,* 620 F. Supp. 2d 86 (D.D.C. 2009); *C.G. AND B.S. v. Five Town Com. Sch. Dist.,* *citing County Sch. Bd. of Henrico v. Z.P.,* 399 F.3d 298, 306 n.5 (4th Cir. 2005); *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 768 (6th Cir. 2001).  .

deficits, without building on the strategies which she needs to be successful.  The

District did just that.   The Hearing Officer attempted to mask the deficiency in the

District's IEP by finding as a "fact" that it contains goals directed toward phonemic

awareness.  HO FF No. 22.  The IEP contains no such goals, and District witnesses

could identify none.  Tellingly, the Hearing Officer did not cite to a single page in the

nearly 1700 page record to support this finding.   In fact, the Hearing Officer

commented during the hearing that the District's IEP was "nebulous" as to how it

would provide literacy to Rachel.  N.T. at 1356.   A nebulous program does not confer

FAPE to a child like Rachel who so clearly needs an explicit and systematic method

instruction in order to make progress.[48]

TALK's reading program, by contrast, is intertwined with the Association

Method.  It contains numerous phonemic goals which move Rachel ahead as an

independent reader.  It provides a highly systematized program for teaching Rachel to

read and write while at the same time expanding her vocabulary and improving her

---

[48]    The Hearing Officer concluded that the District's IEP, like TALK's,
contained a multi-sensory process for teaching Rachel to read: tracing in sand, tracing a
projected letter on the wall and shaping letters from wicky sticks.  HO FF 24.   None of
these things is listed in the District's IEP.  Although the IEP states that the District will
use a "multi-sensory approach to learning" it does not describe what that means.  The
Hearing Officer's list of multi-sensory strategies comes from the testimony of a teacher
who never taught Rachel and who would not have been her teacher had she returned to
the District for the 2007-08 school year.  N.T. at 903; 801.

TALK's program, by contrast, is driven by the "seven steps" of multi-sensory
instruction, which includes saying, reading, associating sounds with symbols and/or
pictures, lip reading, recall of oral language, identification of selected language through
auditory stimuli and written memory for the language structure.  P-95 at 7; N.T. at 54;
137.  According to her teacher at TALK, "Rachel needs to see it, feel it, write it and say
it." N.T. at 252.  There is no evidence that the strategies the Hearing Officer cites as
"multi-sensory" in nature would be appropriate for Rachel.  Rachel needs multi-sensory
strategies to compensate for her faulty auditory memory.  She needs the assistance of
linguistic and visual memory (not wicky sticks) to make progress.  N.T. at 1141; 1157.

articulation.   The District's program, of course, contains no writing goals and no system for coordinating Rachel's reading goals with her speech and language program.[49]

### c.   Math

Many of the Math goals on the District's IEP are similar to those found on TALK's IEP.  TALK includes some additional goals, of course, but it also provides daily instruction in Math.  Like its reading program, the District's IEP would have provided Rachel with just two or three periods of Math instruction per week.[50]  Like her other academic instruction, Rachel requires intense and consistent instruction.  Math, in particular, is difficult for Rachel because it is abstract and language-based.  N.T. at 248; 378.   With daily instruction, Rachel made a full year of progress in Math during the 2006-07 school year.  In light of the difficulties Rachel has and will continue to experience in Math due to her neuro-cognitive impairments, there is no basis in the record to support a reduction in Math instruction from five times per week to two or three.  N.T. at 1400; 1447.

### d.   Social Studies and Science

The District's IEP provides Social Studies goals focused on money skills which it adopted from TALK's IEP.  TALK, however, provides a PDE-approved curriculum in Social Studies which supplements those goals.  Likewise, TALK, but not

---

[49]   The Hearing Officer concluded that the District would have used the Zaner-Bloser curriculum for writing.  The IEP itself, however, contained no writing program and no goals or objectives designed to develop Rachel's ability to write.

[50]   Interestingly, the District criticized TALK's Math program during the hearing contending that Rachel might need more Math instruction than she was receiving there when its own IEP called for less instruction.   N.T. at 1403.

the District, provides a half-year Science curriculum.  The District's IEP provides for

minimal exposure to these areas of the general curriculum.

### B.   THE HEARING OFFICER'S CONCLUSION THAT TALK WAS NOT APPROPRIATE WAS CLEARLY ERRONEOUS

The Hearing Officer's Decision that TALK was an inappropriate placement for

Rachel was premised on two basic principles.  First, the Hearing Officer criticized the

decision Rachel's parents made to place Rachel at TALK because, in her view, it was

not the least restrictive environment (LRE).  Secondly, she disagreed with the

Association Method's general approach to remediating Rachel's disabilities.  Neither of

these was an appropriate basis for rejecting a parental placement.

### 1.   The Hearing Officer Elevated The Parents' Burden Of Proof By Requiring Them To Prove That TALK Was The Least Restrictive Environment

The Hearing Officer inappropriately rejected Rachel's parents' claim for

tuition reimbursement on the ground that TALK was more restrictive than the District's

proposed placement.  The Hearing Officer acknowledged herself that the LRE

requirement which governs school district placements does not apply to parental

placements.[51]   Parents are not bound by the state standards that govern public school

districts. *Florence County School District Four v. Carter,* 510 U.S. 7, 14 (1993).[52]  If

---

[51]   It is unclear why the Hearing Officer spent so much effort on this issue having decided in the previous section of her Decision that the District had offered FAPE (to which she devoted only four sentences).  She acknowledged that having so decided, there was no reason for her to decide the issue of TALK's appropriateness for Rachel.  Decision at 18.  The Hearing Officer's perception that Rachel was "owed" the opportunity to participate with appropriate supports in the larger world of a typical public school" suggests that the Hearing Officer's decision on this point was driven more by philosophy than an individualized inquiry as to what Rachel needed.

[52]   *See also Lauren W. v. Radnor Township School District*, 480 F. 3d 259 (3rd Cir. 2007); *Warren G. v. Cumberland County School District,* 190 F.3d 80 (3rd Cir.

they were, parents could never be reimbursed for private school tuition because by

definition, these cases involve parental decisions to remove their children from a public

school setting to a private school specializing in a particular disability population.

*Florence County, supra,* 510 U.S. at 7; *Burlington v. Department of Educ.,* 471 U.S.

359 (1985).  *See also Warren G. v. Cumberland County School District,* 190 F.3d 80,

84 (3rd Cir. 1999)(the "imposition of the least-restrictive environment requirement on

private placements would vitiate the parental right of unilateral withdrawal").

      Clearly, then, the Hearing Officer unilaterally imposed an additional element

upon Rachel's and her parents' burden of proof which the Supreme Court has

specifically rejected.  *See e.g., A.D. v. Bd. of Educ. Of City Sch. Dist.,* 690 F. Supp. 2d

193 (S.D.N.Y. 2010)(reversing a Hearing Officer decision which elevated the parents'

burden of proof by requiring a private school to meet the standards for evaluations and

IEP's applicable to public school placements, none of which are required in private

schools).[53]   Whether TALK is the LRE for Rachel is not even a question the Court

needs to address.  The only relevant issue is whether TALK provides instruction

designed to meet  Rachel's unique needs, supported by services permitting her to

--------

1999); *Richardson Indep. Sch. Dist. v. Michael Z.,* 561 F. Supp. 2d 589 (N.D. Tex.
2007)(appropriateness of unilateral private placement is not gauged by the same
standards applicable to alternative public placements, i.e., the requirements contained
in the IDEA's definition of FAPE); *C.B. v. Garden Grove Unified Sch. Dist.,* 655 F.
Supp. 2d 1088 (C.D. Cal. 2009)(approving private parental placement even though it
did not have certification to provide social skills training, one of the child's areas of
need).

    [53]   Tuition reimbursement may be denied if parental placement cannot meet
the child's needs.  *See Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F. 3d 105 (2d Cir.
2007)(denying tuition reimbursement because staff members at private school were not
qualified to meet the student's unique needs).  That is not the case here.  There is no
question that the program at TALK is specifically designed to address Rachel's needs.
By the District's own admission, Rachel made appropriate progress at TALK.

benefit from that instruction.  In other words, Rachel's parents may be reimbursed even if TALK  is more restrictive than the program proffered by the school district.  *Bd. Of Educ. Of Chicago v. Illinois State Bd. Of Educ.,* 2006 U.S. Dist. LEXIS 45532 (N.D. Ill. 2006).  Parents need not seek out the perfect placement, just an appropriate one. *Ridgewood, supra,* 172  F.2d at 249 n. 8; *Warren G., supra,* 190 F.3d at 80; *Kruelle v. New Castle Cty. Sch. Dist.,* 642 F.2d 687, 695 (3rd Cir. 1981).[54]

Even if the Court were authorized to address the LRE issue, the question as to whether a placement is theoretically less restrictive begs the question whether it is less restrictive for the particular child in question.  In this case, TALK is the least restrictive *appropriate* placement for Rachel in light of the severity of her communication disorders and the specific fit between those deficits and the intensive communication program TALK provides to address them.  Although TALK is a private school for students with disabilities, it is the least restrictive *appropriate* environment for Rachel given its unique ability to address her  complex communication disorders.

In spite of the progress Rachel has made at TALK, her speech and language skills are still very much impaired in relation to those of her typically developing peers. She would still need very specific facilitation to take advantage of any sort of inclusion in a public school setting.  Left to chance, there is no reason to predict that her speech or her other social skills will improve naturally just because she is exposed to a general school population.  The opportunities she would need to practice those skills would most likely never occur without an adult whose responsibilities include specifically

---

[54]   *Accord Cleveland Hieghts-University Heights City Sch. Dist., v. Boss,* 144 F.3d 391, 400 (6th Cir. 1998); *Murphysboro v. Illinois Bd. Of Educ.,* 41 F.3d 1162, 1168 (7th Cir. 1994); *See also Richardson Indep. Sch. Dist. v. Michael Z.,* 561 F. Supp. 2d 589 (N.D. Tex. 2007)(parental placement need not duplicate exact proper placement required under the Act).

facilitating Rachel's participation and teaching her the skills that she would need to take advantage of those opportunities.  N.T. at 1371;1470.

The District's IEP provide no specific strategies to make this happen. Likewise, it  provides for no adult facilitation of Rachel's interaction with her peers.[55] More fundamentally, however, the District's IEP provides for only 20 minutes of inclusion at the end of each day.  N.T. at 834.  This  would not have added a meaningful component to Rachel's program particularly when viewed in light of what she would have given up by moving back to the District before she was ready to do so.[56]  *See e.g., Bd. Of Educ. v. Wilhelmy*, 54 IDELR 58 (S.D. Ohio 2009)(limited benefit from typical peers would not outweigh need for intensive services focused on oral communication delays, particularly where there was a small window of opportunity for child to acquire oral language and close the gap between herself and typically developing peers).  Moreover, because of where Rachel is in terms of her communication skills and her academics, much of her learning is solitary.  Having similar language peers might be advantageous but not essential for her at this point. N.T. at 1186.

The Third Circuit dealt with a similar situation in *S.H. v. State Operated School District of the City of Newark, supra,* and came to this very conclusion.  The Court rejected the school district's LRE argument because the extent to which the child

---

55  The IEP does not provide Rachel an aide for home room.  P-72.  Moreover, the District admits that there are not enough aides for the life skills children when they scatter to their respective home rooms.  N.T. at 834-35.

56  A placement that is not calculated to provide a meaningful educational benefit is unacceptable.  Under such circumstances, it is irrelevant if it is least restrictive.  *Montgomery Twp. Bd. Of Educ. v. S.C.,* 135 Fed. Appx. 534, 538 (3rd Cir. 2005); *S.H. v. State Operated School District of the City of Newark,* 336 F.3d 260, 272 (3rd Cir. 2003).

would actually be exposed to children without disabilities in the public school program

was *de minimus* and not meaningful. The district was arguing that its public school

placement offered the child the opportunity to interact with non-handicapped children

between classes (lunch and recess), and was near the child's home.  In fact, however,

the child would have been segregated for all of his classes and would not have had any

meaningful opportunity to interact in the mainstream school environment.  Therefore,

the Court concluded that the parents' private school choice was the LRE for the child,

even though placement was in a school for students with disabilities.

The same result is appropriate here.  At the beginning of the 2007-08 school

year Rachel's  overwhelming needs in the area of speech and language were far more

pressing than her need to mingle with typical peers for twenty minutes a day and with

whom she could not independently communicate.  Moreover, Rachel had developed a

sense of "communication competence" at TALK in which she could practice her

communication skills in a nurturing and supervised setting where she is comfortable

trying out her new language skills without fear of negative peer reactions.  N.T. at

1372.  Moreover, Rachel is completely independent in her environment at TALK.

*See e.g., Rose v. Chester County IU,* 1996 U.S. Dist. LEXIS 6105 * 29 (E.D. Pa.

1996)(finding that LRE requirement was satisfied in a parental placement in a

segregated school where benefits of intensive speech therapy outweighed benefit of

simply being in the room with non-disabled children); *M.H. v. New York City Dep't of*

*Educ.,* 54 IDELR 221 (S.D.N.Y. 2010)(parents proved that child would not have reaped

benefit from a less restrictive environment or exposure to peers due to need for 1-1

instruction; child was unable to interact with other students unless prompted by an aid,

that he required intensive instruction and was not ready to model typically developing

peers). *See also A.G. v. Wissahickon Sch. Dist.,* No. 08-3966 (3rd Cir. Mar. 29, 2010)(finding that a school district did not fail to provide FAPE in the LRE where the child made little if any progress on academic goals in his mainstreamed classes and had minimal to no interaction with regular education students).

### 2. The Hearing Officer's Disagreement With TALK's Methodology Is Not a Valid Basis For Her Finding That TALK Was Not An Appropriate Parental Placement

Just as it is inappropriate for a Hearing Officer to reject a parental placement because it is more restrictive than public placement, she may not reject such a placement because of disagreements with the private placement's methodology.  So long as the placement meets the unique needs of the child and provides the supports she needs to address those needs, the parental placement is appropriate for purposes of tuition reimbursement.  *Warren G., supra,* 190 F.3d at 84; *Kruelle v. New Castle Cty. Sch. Dist.,* 642 F.2d 687, 695 (3rd Cir. 1981).  There is no question that TALK's specialized program for children such as Rachel with severe speech and language disorders was an appropriate choice given for her.  Her parents were dealing with complex neurologically-based speech and language disorders which were preventing their daughter from being able to communicate.  They understood how Rachel's speech and language deficits were impacting every area of her life and also recognized how urgent it was to address those deficits as soon as possible.  N.T. at 752; 786.  The District agrees that Rachel's parents sense of urgency was appropriate.  ("The last few years would really be the critical time for speech/lang development..."  N.T. at 1499. Moreover, the District itself admits that Rachel made progress at TALK in accordance with her potential.  P-65, 67; N.T. at 1631-32.

The Hearing Officer reasoned that reimbursement should be denied because Rachel "deserves" to use materials similar to the ones used in the "real world", rather than the ones that TALK provides for her using the Northampton Alphabet. Decision at 19. The Hearing Officer's personal judgment regarding the efficacy of TALK's methodology is not only irrelevant but misplaced.[57] First of all, the evidence clearly establishes that the "Northhampton alphabet" and the color coding used in the Association Method are used as teaching methods, not an end in themselves. At the third level of the Method, Rachel would transition to regular print materials when she was ready to benefit from them. N.T. at 154. Indeed, she was beginning to read regular print as early as January, 2008. N.T. at 398. The Hearing Officer's judgmental assertion that Rachel "deserves" to use print may reflect her personal preference for another method, but that was not the issue before her. Clearly Rachel will read print just as the real world does when she is ready to do so.

Moreover, PDE has seen fit to license TALK to provide special education students such as Rachel who suffer severe speech and language impairments with full knowledge that its program is based on the Association Method. Indeed, the Pennsylvania Training and Technical Assistance Network (PATTAN) has offered state-wide trainings on the Association Method. N.T. at 469. The Hearing Officer's gratuitous opinion as to what Rachel "deserved", therefore, is meaningless. The Commonwealth of Pennsylvania has approved licensed TALK and approved its curricula for the precise reason that children with disabilities such as Rachel are

---

[57]  Because the issue here is the adequacy of a parental placement, not a placement by the District, the Hearing Officer's reliance on *Lachman v. Illinois State Board of Educ.,* 852 F.2d 290 (7th Cir. 1988). *Lachman* was not a tuition reimbursement case at all. The parents there were arguing that their son could be fully mainstreamed in his public school placement if the District adopted a different methodology than the one set forth in his IEP.

entitled to services which meet their individual needs.  By definition, those services are going to be different than those generally used for mainstream children in the "real world."  "  *See Battle v. Commonwealth,* 629 F.2d 269, 277 (3rd Cir. 1980)("The Act appears to focus on those needs which derive from the difference between the handicapped child and the normal child").

Even if the Association Method would not be appropriate for the majority of special education children, the District's own independent expert leaves no room for argument that TALK's approach has met Rachel's needs.  P-65.  That is the only thing that matters here.  N.T. at 1160.  Moreover, the Hearing Officer credited the expert report by Dr. Caviness who marveled at how well Rachel had done at TALK and how well suited the Association Method was to her unique disabilities.  P-89.  Rachel's demonstrated response to the Association Method, according to Dr. Caviness, "has been extraordinary".  HO FF No. 5; P-89 at 4.  Dr. Caviness stated that the Association Method is particularly suited to Rachel's specific neurological profile, and that her progress using this method is "beyond what would be predicted on the basis of standardized cognitive measures".  P-89 at 2.  It is "foreseeable that her progress would essentially become arrested in the absence of this instructional regimen and methodology."[58]  *Id.* at 4.  The Hearing Officer's conclusion that TALK's methodology renders it inappropriate for Rachel must be reversed.

---

[58]   Dr. Caviness's Curriculum Vitae can be found at P-102.

3.      **The Hearing Officer's Finding That Rachel Has
Not Made Progress Pursuant To The Integral
Stimulation Method Is Irrelevant And Unsupported
By The Record**

The Hearing Officer completed her assault on the parental placement here by
claiming that Rachel has not made articulation progress pursuant to TALK's
implementation of the Integral Stimulation Method.  She cross-references three of her
Findings of Fact to support this aspect of her decision.  In Finding No. 50, she
concluded that the Integral Stimulation Method lacked robust research, and that it went
against the prevailing view that the use of various strategies is the way to approach
speech and language treatment.  In Finding No. 51 she concluded that based on
standardized testing which took place well after the 2007-08 school year began, Rachel
made only three fewer articulation errors than she did before she went to TALK in
2005.  Likewise, in Finding No. 52 she claims that Rachel's tested mean length of
utterance has remained the same since she has been at TALK, although she concedes
that in spontaneous speech Rachel's utterances are longer.  As set forth more fully
below, none of these findings support a conclusion that TALK was not an appropriate
parental placement.

a.      **Rachel's Parents Are Not Required To Choose
A Placement Which Utilizes Research-Based
Methodologies**

Just as parental placements are not required to satisfy the LRE requirements
that apply to public placements, they are not required to select placements which utilize
research-based methodologies.[59]  The Hearing Officer has added yet another layer to

---

[59]   The Hearing Officer goes on in Finding No. 50 to conclude that there is no
research link between the Association Method and literacy.  Even if that were true, it is

Rachel's parents' burden of proof, one which is not required by the IDEA or sanctioned by the United States Supreme Court. The law could not be clearer that parents are not bound by the state standards that govern public school districts. *Florence County School District Four v. Carter,* 510 U.S. 7, 14 (1993).[60]

Moreover, the Hearing Officer's conclusion that the Integral Stimulation Method runs counter to the "prevailing view" that it is better to use various strategies to approach speech and language treatment -- whether true or not -- has no bearing on this case if it works for Rachel. More to the point, unless Rachel's parents had any reason to believe prior to the 2007-08 school year that the Integral Stimulation Method was not allowing Rachel to make progress toward her articulation goals, there is no basis for her conclusion that TALK was not an appropriate parental placement.

The Hearing Officer attempts to establish just that through reference to standardized testing that was done well after the school year began. HO FF No. 51; P-78 (January, 2008); P-85 (April, 2008). Parents, like school districts, cannot be expected to make placement decisions based on information which did not exist at the time. Thus, even if the testing which was done during the 2007-08 school year supported the Hearing Officer's conclusion as to the efficacy of the Association Method for Rachel, it would be irrelevant. The Hearing Officer herself acknowledged

not relevant because the record clearly establishes that Rachel is acquiring literacy pursuant to the Method. Curiously, the Hearing Officer concluded that the District offered Rachel an appropriate reading program which was "nebulous", suggesting that she was inappropriately applying a higher standard to the parental placement than she did upon the District. N.T. at 1356.

[60]    Indeed, even school districts are not required to utilize research-based methods if such methods are ineffective to address a child's needs or otherwise not appropriate. *See e.g., Souderton Area S.D. v. J.H.,* 2009 U.S. Dist. LEXIS 10781 (E.D. Pa. 2009), *aff'd,* 53 IDELR 179 (3d Cir. 2009)(District's choice of a writing methodology which was not research-based did not deny FAPE because it was identified as a "best practice".)

that the placement decision for Rachel had to be evaluated based on what the parties knew when the placement decision was made.  Decision at 15; N.T. at 72; 382.  *See also Fuhrmann v. East Hanover Sch. Dist.,* 993 F.3d 1031, 1040 (3rd Cir. 1993).  Rachel's parents knew from TALK's articulation data that by the end of the 2006-07 school year she had made good progress in this area.  P-105 at 5-6.  Indeed, Rachel has continued to meet her articulation goals since she came to TALK and to receive new and more complex goals every year.

The Hearing Officer's conclusion that Rachel did not make progress in articulation based on standardized tests which she specifically found to be inadequate to measure such progress constitutes reversible error.   Indeed, she found as a fact that "Rachel's impulsivity, word retrieval deficits, low performance levels and difficulty generalizing skills interfere greatly with the reliability of standardized assessments."  HO FF No. 6.[61]  Her reliance on the Goldman-Fristoe, which is a standardized articulation measure, contradicts her own finding that such measures do not fairly evaluate Rachel's progress in any area, particularly one in which her apraxia and other motor planning deficits so significantly interfere with her performance.[62]  *L.G. v. Bd. of Educ. Of Hyde Park,* 368 F. Supp. 2d 313, 327 (S.D.N.Y. 2005)(Hearing Officer's

---

[61]   It is important to note that while Rachel was enrolled in its programs the District itself did not rely on standardized measures to test Rachel's progress in speech while she was enrolled in its programs.  *See e.g.,* P-27.  Standardized tests alone, as the Hearing Officer pointed out during the hearing and again in her Decision, do not provide a basis to gauge Rachel's progress in any area.   *See* N.T. at 590.

[62]   The Hearing Officer also mis-stated the results Rachel obtained on the 2008 Goldman-Fristoe, contending that she made only 3 fewer errors than she had when it was administered in 2005.   In fact, Rachel made 7 fewer errors.  P-105; N.T. at 1497.

reliance on single standardized test to determine lack of progress was error when there was considerable evidence that the child did make progress).

Moreover, the Hearing Officer's conclusion that Rachel's "static" scores on the Goldman-Fristoe do not evidence any progress over time is substantively incorrect. The test is normed on the basis of age and gender.  The fact that Rachel's standard scores on the Goldman-Fristoe have remained relatively constant over the years demonstrates that she is making steady progress.[63]  N.T. at 1190; 1136; 1204.[64] Furthermore, the District's own speech and language expert indicated that Rachel's performance on the Goldman-Fristoe is impacted by the structural abnormalities in her mouth.  N.T. at 1539; SD-4 at 2.  Regardless of her actual scores on the test, Rachel can make all but 6 of the sounds which are tested by the instrument.  *Id.*  No one has suggested that she could do this when she first went to TALK.

The record is clear that Rachel's performance on the Goldman-Fristoe tells us nothing except that her sound production is inconsistent.  N.T. at 1209.  All children with apraxia will show variability because of their motor planning deficits.  N.T. at 553; 603.  Even among apraxic children, however, Rachel's variability is unique.  N.T. at 598.[65]  The record is equally clear that not only has Rachel made impressive

---

[63]  As Ms. Medley pointed out, the Goldman-Fristoe is a global snapshot in time which looks at what Rachel is doing in relation to the typical population.  That is not helpful in determining her progress from day to day because Rachel makes gains in such small and discrete increments.  N.T. at 1135.

[64]  The Hearing Officer admonished the District's psychologist for her representation that Rachel's standard scores on an achievement test reflected a lack of progress.  Rachel's steady standard scores over the course of three administrations showed that she made three years of progress.   According to the Hearing Officer, "*You do have to make a year's progress in order to keep the same standard score; trust me on that.*"  N.T. at 1067; *see also* N.T. at 1389.

[65]  Rachel's standardized scores on the Goldman-Fristoe were impacted by her test anxiety.  N.T. at 590.

improvements in articulation, but her overall ability to use language has improved.

N.T. at 254; 1063; 1133.[66]   The Hearing Officer's conclusion that Rachel's placement

at TALK was inappropriate based on her performance on standardized test scores,

therefore, must be reversed.

### C.   THE EQUITIES DO NOT SUPPORT THE DENIAL OF TUITION REIMBURSEMENT

Even where a school district fails to offer FAPE and the parentally chosen

placement is appropriate, tuition reimbursement may be denied on equitable grounds

"upon a judicial finding of unreasonableness with respect to the actions taken by the

parents." 20 U.S.C. § 1412 (a)(10)(C)(iii)(III).   Courts which have interpreted the

IDEA's equitable provisions regarding tuition reimbursement have been careful to limit

their application to cases in which parental conduct obstructs the IEP process and

prevents the district from performing its duties under the Act.  *See Hogan v. Fairfax*

*Co. Sch. Bd.,* 645 F. Supp. 2d 554 (E.D. Va. 2009)(although parents failure to respond

to phone calls and adversarial tone may have made the process more difficult, parents

did not single-handedly derail it).   In a case such as this one, in which the school

district had complete access to the child's educational and medical records and failed

nonetheless to offer a program that met the child's needs, forfeiture of tuition

reimbursement on equitable grounds is not appropriate.   Congress clearly did not intend

---

[66] For the same reasons cited above, the Hearing Officer's reliance on Rachel's tested mean length of utterance does not support her conclusion that the Integral Stimulation Method is inappropriate for Rachel.  First of all, Integral Stimulation is used for articulation drill and practice, not the use of language. Secondly, even the Hearing Officer admits that Rachel has made progress in her use of language which is not captured on standardized testing measures.  HO FF No.  52.  The record is clear that Rachel's mean length of utterance goes down when she is being tested.  N.T. at 274; 1128.  It is equally clear that Rachel's ability to use language has improved dramatically since she went to TALK.  N.T. at 274; 1131; 1209.

equitable principles to be used against parents to punish them for honest  differences of opinion.  *See e.g., M.V. v. Shenendehowa Central Sch. Dist.*, 2008 U.S. Dist. LEXIS 182 (January 2, 2008 N.D.N.Y.)(equitable principles did not justify reduction in tuition reimbursement where parents cooperated with the district by attending IEP meetings, communicated their concerns to the district in writing, and served as active participants in the placement process); *N.R. v. Dep't of Educ. v. Sch. Dist. Of the City of New York*, 2009 U.S. Dist. LEXIS 27273 (S.D.N.Y. 2009).

       The Third Circuit recently interpreted the tuition reimbursement forfeiture provision in *C.H. v. Cape Henlopen Sch. Dist.,* 606 F.3d 59, 72 (3rd Cir. 2010).  There the Court found that forfeiture should apply because the parents had engaged in conduct that delayed the IEP process, interfered with the District's ability to timely evaluate the child, and then failed to provide timely notice to the District that they had placed their child in a private school.  *See also Roland M. v. Concord Sch. Comm.,* 910 f.2d 893, 995 (1st Cir. 1990)(the law ought not to abet parties who block assembly of the required team and then, dissatisfied with the ensuing IEP, attempt to jettison it because of problems created by their own obstructionism").  No such conduct is present here.  There is no dispute that Rachel's parents gave the District unrestricted access to Rachel's records from TALK, gave the District access to Rachel for purposes of evaluation, and did everything they could to move the IEP process forward.  Complaint and Answer at ¶ 85.  *See also* P-70; N.T. 693-695.  Indeed, it was Rachel's parents, not the District, who initiated the IEP process for the 2007-08 school year after Dr. Herzel issued her report.  P- 68; N.T. at 685.  By that point in late July the District had taken no action to provide a program for Rachel.

The Hearing Officer inappropriately concluded that the equities in this case militate against tuition reimbursement because Rachel's parents "pre-determined" that they would be keeping Rachel at TALK before the August 20, 2007 IEP meeting.  The fact is, however, that *the District*, not Rachel's parents, pre-determined *before* the August 20, 2007 IEP meeting that it would not consider funding Rachel's placement at TALK.  There can be no dispute about this because the District came to the August 20, 2007 IEP meeting with a NOREP which had been signed by the District's superintendent that same day.  The NOREP states in black and white that the District had already rejected TALK as a possible placement for Rachel.  P-72 at 1-2 .

It was the District, not Rachel's parents, that prevented an interactive discussion regarding Rachel's placement for the 2007-08 school year.  In fact, the District came to the meeting with no school psychologist.  Although Rachel's overriding area of weakness is in the area of speech and language and the District was well aware that the intensity of Rachel's speech and language program had always been their primary concern, the District came to the meeting with a speech and language supervisor who did not know Rachel, having already decided to reduce the amount of Rachel's speech and language services below what the District had provided before she went to TALK and reducing its intensity by delivering those services in a group rather than individually.[67]  Although Rachel had significant sensory needs which were being addressed in great detail in her program at TALK, and the District had unilaterally selected just two of the 22 occupational therapy goals from TALK's IEP, the District brought no occupational therapist to the meeting.  *C.f.,* P-60 at 26-36 and P-71.  Clearly the District was not intending to have a meaningful conversation with Rachel's parents

---

[67]  A list of the people who attended the IEP meeting can be found at P-72 at 4.

about her speech and language program or anything else.  Indeed, the IEP was already

written and the placement established well before the meeting began.  *See* P-71.

As a matter of law, the Hearing Officer's conclusion that the equities prevent

tuition reimbursement on the ground of parental pre-determination must be reversed.

The Hearing Officer made a credibility determination against Rachel's parents on the

basis of pre-determination without even considering the District's own documentary

evidence to the contrary.  The District was legally required to come to the IEP meeting

with an open mind but the NOREP constitutes irrefutable proof that it did just the

opposite.[68]  While districts are free to propose a particular placement, they must also

consider any placements the parents suggest.  *H.B. v. Las Virgenes Unified Sch. Dist.,*

239 Fed. Appx. 342 (9th Cir. 2007).   *See also Spielberg . Henrico Co. Public Schools,*

853 F.2d 256 (4th Cir. 1988)(district's decision to place the child in a particular location

and then developing an IEP to support that pre-determined placement violates the

child's right to FAPE); *see also T.P. v. Mamaroneck Union Free Sch. Dist.,* 2007 U.S.

Dist. LEXIS 35288 (S.D. N.Y. 2007)(district which pre-determines termination/change

in services may be liable for FAPE denial); *J.M. v. East Greenwich Twp. Bd. Of Educ.,*

---

[68]   *See also W.G. v. Board of Trustees of Target Range Sch. Dist.,* 960 F.2d 1479, 1484 (9th Cir. 1992)(school district came to IEP meeting with a completed IEP to place child in a pre-existing, pre-determined program and refused to consider alternatives); *Berry v. Las Virgenes Unified Sch. Dist.,* 54 IDELR 73 (9th Cir. 2010)(superintendent's remark at IEP meeting indicating that the discussion would focus on student's transition back to public school demonstrated pre-determination)*; Penny B. v. Las Virgenes Unified Sch. Dist.,* 52 IDELR 163 (C.D. Cal. 2008)(district came to meeting to discuss "transition to public high school" and was therefore not open to discussing continuation of private placement);.  *Accord Reed Union Sch. Dist.,* 52 IDELR 240 (SEA CA 2009)(district which comes to team meeting with placement in mind and merely to convey decision to parent violates parents's right to meaningfully participate in IEP).

50 IDELR 136 (D.N.J. 2008)(district offered two options, a self-contained classroom or beginner's kindergarten but rejected parent's request to discuss mainstream options).

The Hearing Officer's credibility conclusion is predicated primarily on what was discussed during the IEP meeting. She found as a fact that Rachel's parents and Dr. Levine, their advocate, did not ask any questions at the meeting regarding the District's program or otherwise express what concerns they had about the District's IEP. HO FF No. 69; 71. According to the Hearing Officer, the only request Rachel's parents expressed at the meeting was that the District add cursive to Rachel's IEP because that was what she was used to using at TALK. HO FF No. 69. The District admits, however, that there was far more discussion. Mrs. Goodine took notes during the meeting which are contained in the record on the draft IEP. P-71. These notes reflect that the parties went through the entire 33-page document that numerous issues were addressed. They discussed Rachel's medication, P-71 at 4; the lack of intensity in the District's reading program, particularly in the area of decoding, P-71 at 5; and the specific wording of Rachel's listening comprehension goals. Indeed the Hearing Officer found that one of the specific concerns Rachel's parents addressed during the meeting was that "it was not academic enough." HO FF No. 71. After the meeting the District made numerous changes to the IEP to reflect what took place during the meeting. The District edited the opening narrative to the IEP to reflect changes regarding Rachel's reading needs and also modified one of her Math goals, P-72 at 19. It increased one of her reading goals, P-72 at 22; likewise it changed one of her listening comprehension goals. P-72 at 23. It is implausible that the District would have made any programmatic changes to Rachel's IEP after the IEP meeting if no programmatic issues had been discussed.

The Hearing Officer bolsters her conclusion that Rachel's parents had pre-determined Rachel's placement because they did not ask to see any classrooms.  HO FF No. 71.  She neglects to mention, however, that school was not in session at the time.  *See also M.V. v. Shenendehowa Central Sch. Dist., supra,* (excusing parental failure to visit a proposed program which they had investigated and concluded to be inappropriate).

Although the Hearing Officer found that Rachel's parents went into the IEP meeting requesting that the District continue Rachel's program at TALK, they had voluminous data from TALK indicating that Rachel was making good progress there which had bee confirmed by the independent evaluator.  Imagine their confusion when they arrived at the meeting only to find that the District was claiming that Rachel had no progress when the independent evaluator so clearly said she did.  Moreover, the District had represented to Rachel's parents that the reason for the independent evaluation was to determine whether Rachel's program at TALK should continue.  N.T. at    .  Moreover, the District's IEP, proffered less than two weeks before school was scheduled to begin, was inappropriate on its face.  It was so fundamentally flawed that Rachel's parents had no choice but to conclude that it would not provide FAPE to their daughter.  They sincerely believed that the District was not equipped to meet Rachel's needs, much less implement her IEP.  There is no basis to conclude that this opinion was based on anything other than pure motives and their desire to ensure that Rachel has a chance to communicate and learn in accordance with her own potential.  Indeed, the Hearing Officer wrote in her decision that Rachel's parents were "seeking what they were led to believe was the best possible program to address Rachel's educational needs."  Decision at 14.  This is not the type of situation in which Congress envisioned

an equitable forfeiture of tuition reimbursement.  The Hearing Officer's decision must therefore be reversed.

By: lm9023 _____

LORRIE McKINLEY, Esquire

ID# 41211

Counsel for the Plaintiffs


McKINLEY & RYAN, LLC

238 West Miner Street
West Chester, PA 19382
Telephone (610) 436-6060
Facsimile (610) 436-6804


DATE:  August 10, 2010