```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | | |
|---|---|---|
| Rachel G., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DOWNINGTOWN AREA SCHOOL | : | |
| DISTRICT | : | NO. 09-3512 |

MEMORANDUM

McLaughlin, J.                                         July 7, 2011

This suit arises from the plaintiffs' unilateral decision to place their daughter Rachel G., a disabled minor, in a private school for the 2007-08, 2008-09, and the 2009-10 school years. Rachel suffers from congenital birth defects that significantly impair her ability to acquire speech, sensory impairments that impair her fine and gross motor abilities, and learning disabilities. Because of these disabilities, Rachel is entitled to special education and related services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq. The plaintiffs contend that the defendant Downingtown Area School District ("District") failed to provide Rachel with a free and appropriate public education ("FAPE"). The plaintiffs seek tuition reimbursement for Rachel's placement in private school. Both parties have filed motions for summary judgment. The Court will grant the defendant's motion for

summary judgment and deny the plaintiffs' motion for summary judgment.

I.   Background and Procedural History

Rachel is a minor student who resides in the Downingtown Area School District.  She suffers from apraxia and holoprosencephaly ("HPE"), which significantly impair her ability to acquire speech.  In addition to these defects, Rachel suffers from learning disabilities, particularly in math and reading, and has sensory impairments that impair her fine and gross motor abilities.

Rachel attended school in the District for kindergarten and the first two months of first grade.  The District agreed to partially fund Rachel's program at the TALK Institute ("TALK") (formerly Magnolia Speech School) for the remainder of first grade and for the 2006-07 school year.  The parties disagree about the amount of progress Rachel made at TALK.  The District refused to provide continued financial support for Rachel's program at TALK for the 2007-08 school year.

Rachel's parents initiated due process proceedings to seek reimbursement for her attendance at TALK for the 2007-08 school year.  The hearing was held over seven sessions conducted between October 21, 2008, and March 17, 2008.  The hearing officer denied the plaintiffs' request in a decision dated May 3,

2009. The plaintiffs then brought this civil action seeking reversal of that decision and other relief.

In this action, the Court denied the defendant's motion to dismiss without prejudice after holding oral argument. The parties pursued settlement, but were unable to come to an agreement. The parties have submitted cross motions for summary judgment for the plaintiff's IDEA claim (count I) and the Court held oral argument on the pending motions.[1]

II. Statutory Background

The plaintiffs seek review of the hearing officer's decision under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA"). The IDEA requires that states must provide a free and appropriate public education to all children with disabilities in their jurisdiction to receive federal education funding. 20 U.S.C. § 1412. A free and appropriate public education consists of education designed to meet the unique needs of the handicapped child, supported by such services as are necessary to allow the child to benefit from the instruction. S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 264 (3d Cir. 2003) (citing Susan N. v. Wilson Sch.

---

[1] The plaintiffs also bring a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 791, et seq., and the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (count II).

3

Dist., 70 F.3d 751, 756 (3d Cir. 1995)). Schools provide a child with a free and appropriate education through an Individualized Education Program ("IEP"). Id.; 20 U.S.C. § 1414(d).

Under the IDEA and its implementing regulations, each state and local educational agency is required to locate, evaluate and identify every child with a disability who resides within their boundaries. See 34 C.F.R. Part 300. The statute provides procedural safeguards to ensure that all identified disabled children in states accepting federal funding for education for the disabled will receive a FAPE. See 20 U.S.C. § 1415(a).

The IDEA allows the parent of a disabled child or the state to file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate education to such child." 20 U.S.C. § 1415(b)(6). The filing of such a complaint gives rise to a due process hearing, which is conducted in compliance with state procedures. 20 U.S.C. § 1415(f)(1). Under Pennsylvania law, a hearing officer presides over a due process hearing. See Mary Courtney T. v. Sch. Dist., 575 F.3d 235, 240 (3d Cir. 2009).

After a hearing, any party aggrieved by the findings and decision made in the process hearing has the right to appeal to a federal district court. See 20 U.S.C. § 1415(i)(2)(A).

4

Under Pennsylvania law, the decision of the hearing officer may be directly appealed to a court of competent jurisdiction. See 22 Pa. Code § 14.162.

III. Standard of Review

A federal district court reviewing factual findings from the administrative proceedings conducts a modified de novo review. The court is required to give "due weight" to the administrative body's factual findings. S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003); Shore Regional High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (describing the District Court's burden as "unusual" insofar as it "must make its own findings by a preponderance of the evidence" but "must also afford 'due weight' to the ALJ's determination"). Under this standard, "factual findings from the administrative proceedings are to be considered prima facie correct," and "if a reviewing court fails to adhere to them, it is obliged to explain why." S.H., 336 F.3d at 271.

If a state administrative agency has heard live testimony, the hearing officer's credibility determinations are due "special weight." P.S., 381 F.3d at 199. A district court must accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record

would justify a contrary conclusion." Id. (citations and quotations omitted).

IV. Hearing Officer's Decision

The hearing officer conducted hearings over six days between October 21, 2008 and March 17, 2009.[2] Based on these hearings and an extensive record, the hearing officer issued seventy-two findings of fact ("F.F."), which are summarized here.

Rachel resides in the Downingtown Area School District. Rachel was born with a severe cleft lip and palate and has articulation difficulties. Rachel also has holoprosencephaly ("HPE"), a malformation of the brain in which the left and right hemispheres are not properly divided. Her cognitive and academic skills, which range from age level and above to moderately to severely impaired, are scattered and inconsistent. Most individuals with HPE never acquire self-care skills or communication capacity, but Rachel's academic skills are "extraordinary" and "approach the unique" given her HPE. Rachel's impulsivity, word retrieval deficits, low performance levels, and difficulty generalizing skills greatly interfere with the reliability of standardized assessments and tests. F.F. ¶¶ 1-6.

---

[2] The hearing officer, Dr. Linda Valentini, holds a doctoral degree in clinical psychology and is both a licensed psychologist and a licensed school psychologist.

Rachel requires concepts and skills to be taught slowly and repeatedly. Once Rachel learns a skill, she commits it to long term memory. Rachel's functional skills are greater than would be predicted by her low standardized cognitive scores. Rachel engages others in conversation, helps out around the home, displays self confidence, an appropriate sense of humor, and independence in non-familiar environments. She participates in developmentally typical social activities such as Girl Scouts and sports. F.F. ¶¶ 7-8.

During 2004-2005, Rachel attended kindergarten (2004-05) at West Bradford Elementary School ("West Bradford") in the Downingtown School District. Rachel's teacher described her as being very verbal after an initial adjustment period. The hearing officer found that Rachel would spontaneously tell stories and recount goings-on in her daily life. At West Bradford, Rachel was in the Life Skills Program in the morning in a classroom of eight students, and in regular education, with a one-to-one aide, in the afternoon. During her kindergarten year, Rachel received 90 minutes and subsequently 120 minutes of speech/language and individual therapy per week. This amount was increased in February, 2005 to 150 minutes per week. F.F. ¶¶ 9-10.

In the beginning of Rachel's first grade year (2005-06), Rachel was placed in a blended Life Skills program at West

7

Bradford with inclusion in the first grade home room. The hearing officer noted that Rachel's parents never observed either her kindergarten or first grade class at West Bradford despite an open door policy. F.F. ¶ 11, n.4-5.

The District developed an IEP for Rachel's 2007-08 school year that was based on Rachel's education records, additional educational evaluations, and TALK's records. The hearing officer described the District's IEP as offering "identical or very similar goals" to TALK's IEP and found that Rachel's parents only request concerning the IEP was that cursive be used, which was added. F.F. ¶¶ 12-14.

The District's 2007-08 IEP called for 120 minutes of speech weekly, which the hearing officer found to be within the guidelines of the American Speech and Hearing Association ("ASHA"). Under this plan, the District's speech therapists would have worked with Rachel using several approaches as recommended by ASHA. In addition to formal speech/language therapy, Rachel's speech/language needs would be addressed by the classroom teacher, who coordinates related services and instruction with the therapy providers. F.F. ¶¶ 15-18.

The District implements the Edmark method for reading instruction, which is a scientifically-based, highly structured sigh word reading program that is backed with published research supporting its use with students functioning at Rachel's level.

Supplementary materials from the Harcourt curriculum are also used. The District has also purchased and trained staff on Project Read, as recommended by Rachel's parents' curriculum broker. Project Read is backed with published research supporting its use. F.F. ¶¶ 19-21.

The District's 2007-08 39-page IEP includes goals for sight words, multi-syllable words, and sound combinations, which reflect both sight word and phonemic approaches to reading. The 2007-08 IEP offered a multisensory reading program, including tracing in sand and other strategies. The District's IEP would have instructed Rachel using the Zaner Bloser curriculum for writing. Spelling instruction would have incorporated the Edmark program or "100 word" lists. Math would have been taught with the Touch Math curriculum, which the parents' expert psychologist agreed is a highly structured program and was recommended by the parents' curriculum broker. The hearing officer found that the IEP contained in appropriate detail each element mandated by the IDEA. F.F. ¶¶ 21-29.

The District's IEP would place Rachel in a part time Life Skills program with inclusion in regular education as appropriate with support. The Life Skills placement focuses on foundational academics with individualized curricula. In the class proposed for Rachel, there were seven students with a teacher and two aides. The aides accompanied students to regular

education classes when required.  Rachel's classmates were at similar or better reading and math levels.  All had speech and language needs.  Many of the potential classmates, like Rachel, fell into the mild to moderate mental retardation on standardized testing.[3]  The District's IEP called for inclusion with regular education to facilitate education in the least restrictive environment appropriate for Rachel's needs.  The hearing officer found that the parents' private psychologist, who had not visited the proposed classroom, had "no reason to believe" that remediation based on Rachel's specific needs would not be carried out under the District's plan.  F.F. ¶¶ 30-39.  The Hearing Officer concluded that the District's proposed 2007-2008 placement for Rachel was appropriate and the IEP contained all of the required elements.  Hr'g Off. Op. at 17.

The hearing officer went on to discuss Talk's IEP and the balance of equities.  Given her conclusion that the District's IEP was satisfactory, it was unnecessary for the hearing officer to address TALK's IEP and the balance of equities.  The hearing officer explained that "[h]aving established that the District's program . . . represented a [FAPE], it is not necessary to examine the second and third questions regarding the appropriateness of [TALK] and the

---

[3] As previously noted, however, the hearing officer specifically found that Rachel's unique difficulties "interfere greatly with the reliability of standardized assessments."  F.F. ¶ 6.

10

equities.  However, given the investment in time that parties made during this hearing, the following questions are being discussed as in the hearing officer's prerogative."  Id.

Turning to TALK's IEP, the hearing officer discussed Rachel's program and experience at TALK.  Rachel has had the same teacher since she entered TALK in 2005.  Of the four other children in her group, Rachel was the second from the top in language abilities.  TALK exclusively employs the Association Method, which is a multi-sensory phonetics-based incremental program that teaches the written language and how to speak at the same time.  The Association Method emphasizes the systematic introduction of the sounds in speech, which is tailored to individual weaknesses.  The Association Method is used in conjunction with Northampton Symbols, a phonics system where various letter combinations are reduced to a symbol, similar to the pronunciation guide of a dictionary.  At TALK, Rachel received individual therapy from a speech and language pathologist five times per week in 30-minute session and the pathologist was in the classroom for a total of seven hours per week.  F.F. ¶¶ 40-49.

The hearing officer concluded that the Association Method runs counter to the prevailing view that the use of various strategies is the best approach to speech and language treatment.  Nevertheless, after her time at TALK, Rachel makes

fewer articulation errors, but her tested mean length of utterance has remained constant.  At no time during the 2007-08 school year, however, was Rachel able to read a pre-primer book.  The hearing officer noted the lack of published research concerning programs offered by TALK.  In addition, the parents' expert psychologist testified that if she had observed Rachel's lack of progress in counting items, she "would maybe suggest a change in methodology."  Rachel's standardized test scores did not evidence progress in the areas of math, written expression, and general information.  F.F. ¶¶ 50-63.  The Hearing Officer concluded that if it had been necessary to address whether TALK was appropriate, the hearing officer would conclude that it was not.  Hr'g Off. Op. at 19.

Upon reviewing the balance of equities, the hearing officer found that Rachel's parents wanted Rachel to remain at TALK, the parents did not discuss any changes they wanted to be made to the District's IEP except the addition of cursive, the parents did not ask questions about their concerns with the IEP, and the parents concluded the District's IEP was not appropriate despite its "close resemblance" to TALK's IEP.  F.F. ¶¶ 63-72.  The Hearing Officer concluded that if it was necessary to address the balance of equities, the parents did not participate in good faith in the creation of the District's August 2007 IEP and the equities favored the District.  Hr'g Off. Op. at 14, 20.

V. <u>Analysis</u>

The plaintiffs seek tuition reimbursement for Rachel's unilateral placement at TALK. "In a case in which parents seek reimbursement for a unilateral placement, the District Court must first determine whether the IEP afforded the student a FAPE." <u>P.S.</u>, 381 F.3d at 198. A satisfactory IEP must provide "significant learning" and confer "meaningful benefit." <u>T.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ.</u>, 205 F.3d 572, 577 (3d Cir. 2000) (quoting <u>Polk. Ridgewood Bd. of Educ. v. N.E.</u>, 172 F.3d 238, 247 (3d Cir. 1999). The state is not, however, required to "maximize the potential of handicapped children." <u>Id.</u> (quoting <u>Hendrick Hudson Dist. Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 197 n.21 (1982)). "[A]t a minimum, the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." <u>Chambers v. Sch. Dist. of Phila. Bd. of Educ.</u>, 587 F.3d 176, 182 (3d Cir. 2009) (internal quotation marks and citation omitted).

If the District Court concludes that the IEP did not provide a FAPE, the Court must then decide whether the parents took "appropriate actions." <u>P.S.</u>, 381 F.3d at 198 (citing <u>Michael C. v. Radnor Twp. Sch. Dist.</u>, 202 F.3d 642, 651 (3d Cir. 2000)). If the public placement violated the IDEA, the court may consider equitable considerations in granting relief. <u>See</u>

13

Florence Cnty. Sch. Dist. Four v. Carter by & Through Carter, 510 U.S. 7, 16 (1993).

The Court first addresses whether the District's IEP would have afforded Rachel a FAPE. The parties dispute whether the District's proposed IEP was satisfactory under the IDEA. The main issue of contention is whether the District's IEP offered meaningful educational benefit to Rachel for speech and language development. The plaintiffs also argue that the District's IEP was insufficient for other educational categories and that the District's goals for Rachel were inadequate. The District disputes each of these contentions.

### A. Speech and Language

The primary issue of dispute is whether the District's proposed speech and language program would have provided a FAPE to Rachel in light of her apraxia and other disabilities. See Pls.' Mem. at 24 (noting that speech and language are "the most critical element" from the plaintiffs' perspective). The American School Health Association ("ASHA") recommends that a child with apraxia should receive three to five individualized speech therapy sessions per week of thirty minutes each. N.T. at 1550. Prior to attending TALK, Rachel received between 120 and 150 minutes of individual therapy per week at West Bradford. The District's proposed August 2007 IEP called for 120 minutes total

of speech therapy per week, equating to four thirty-minute sessions per week. The District's IEP did not specify whether this speech therapy would have been delivered one-to-one, as a group, or some combination of the two. Pls.' Ex. 72 at 34.

The plaintiffs argue that this ambiguity implies that Rachel would have received no individual therapy under the District's IEP. See Pls.' Mem. at 25-26 ("The District's draft IEP provides for no individualized therapy.") (emphasis in original). This contention was contradicted by testimony during the administrative proceedings. Lillian Neary, Chester County Intermediate Unit Speech Language Pathologist, testified that the District's speech therapy would be a combination of individual and group therapy. Ms. Neary acknowledged that the District's IEP did not specify the exact breakdown between individual and group therapy, but that in her experience, therapy was administered as a mix between the two. N.T. at 1566.

Ms. Catherine Kalogredis, the Life Skills teacher at West Bradford Elementary School, also testified that speech and language goals would be incorporated into Rachel's daily classroom experience. N.T. at 888. Ms. Kalogredis explained that she consults with the school's therapists and they instruct her regarding what skills need to be practiced.

> [I]f a student, for example, has speech apraxia and we're working on articulating or pronouncing certain initial consonants or sound[s] appropriately with a hand gesture,

15

>               the speech therapist will teach me those.
>               And we will do that all day and I instruct my
>               aides how to do that as well so that we
>               create a language rich environment and the
>               student's skills are being addressed
>               constantly, not just in their speech time.

Id.

In contrast, the plaintiff's speech language pathologist Lynne Medley testified that the language therapy proposed by the District would not have enabled Rachel to make meaningful progress toward independent speech and language skills and group therapy is inappropriate for Rachel. N.T. at 1143, 1167-68. The plaintiffs contrast the District's IEP with TALK's proposal, which would provide Rachel with 150 minutes of individual speech and language therapy and seven hours of speech in the classroom. Pls.' Ex. 60 at 41. The Court, however, does not engage in a comparative analysis between which IEP may have provided more services for Rachel. Rather, the Court focuses on whether the IEP offered by the District is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." Chambers, 587 F.3d at 182.

The hearing officer found that Lillian Neary "credibly testified that the goals set forth for Rachel in the [District's] proposed IEP were appropriate and that the level of speech/language services was appropriate to match her need." Hr'g Off. Op. at 14. Furthermore, Ms. Neary "offered credible

testimony that in addition to formal speech/language therapy, Rachel's speech/language goals would be addressed in the classroom daily with all staff being aware of her goals." Id. As noted above, the Court must afford the hearing officer's credibility determinations "special weight." P.S., 381 F.3d at 199.

After a review of the administrative record, the Court does not find reason to disagree with the factual findings of the hearing officer with respect to the District's proposed speech and language therapy. The plaintiffs' argument that the District's proposed therapy would be inadequate rests primarily on the characterization that the IEP provided no individualized therapy. This contention, however, was contradicted by Ms. Neary's testimony. The Court finds that the District's IEP was reasonably calculated for Rachel to receive meaningful speech and language development and that the proposed level of individual therapy was within recommended guidelines.

B.  Other Areas

The plaintiffs contend that the District's IEP was inadequate with respect to Rachel's other school subjects and that TALK's IEP offered "far more ambitious" goals. In addition, the plaintiffs maintain that the District's IEP failed to address

17

phonemic awareness,[4] and instead the District relied solely upon the Edmark program for reading.

The hearing officer found that the Edmark program is a scientifically based, highly structured program that is appropriate for students functioning at Rachel's level. In addition, the District had previously trained staff on Project Read, which is a system deigned to address phonemic awareness, upon the recommendation of the Parents' curriculum broker. The District's IEP did not specifically reference Project Read, but the District's goals for Rachel included goals for sight words and "opportunities to increase phonemic abilities . . . ." Pls.' Ex. 72.

The plaintiffs also argue that the District's IEP did not explicitly state which methodologies the District would use. Testimony during the administrative hearings, however, clarified which methodologies would be used for each subject. Ms. Kalogredis explained that the District uses the Zaner Bloser program for writing as well as supplemental methodologies as appropriate. N.T. at 904. The District also uses the Touch Math curriculum and multisensory techniques for learning, such as using sand to trace letters and wax sticks to form letters.

The plaintiffs further argue that the District's IEP

---

[4] "Phonemic or phonological awareness is the underlying ability to discriminate and order sounds." S.M. v. Weast, 240 F. Supp. 2d 426, 432 (D. Md. 2003).

18

contained an academic curriculum that was premised on the assumption that Rachel is moderately to severely mentally retarded and that TALK's IEP contained more ambitious goals.  The plaintiffs acknowledge that Rachel has been identified as mentally retarded on formal cognitive assessments, but note that standardized tests are not a reliable indicator of Rachel's potential.  Indeed, the hearing officer found that Rachel's unique difficulties interfere greatly with the reliability of standardized assessments.

Rachel's unique difficulties with speech and attention present a considerable challenge for her educators to create appropriate programs, as evidenced by the divergent expert opinions offered by each side.  Compare N.T. at 1616-1622 (Ms. Neary testifying that the District's IEP was an appropriate program for Rachel) with N.T. at 1162-71 (Ms. Medley testifying that the District's IEP does not adequately address Rachel's language needs).  Although the plaintiffs may have desired a more rigorous IEP for their daughter, the Court is mindful of the standard by which the District's IEP must be judged:  the District's IEP must be reasonably calculated for the student to receive meaningful benefit in light of her potential.  See T.R. ex rel. N.R., 205 F.3d at 577; Chambers, 587 F.3d at 182.  A state is not, as the plaintiffs' argument suggests, required to

"maximize each child's potential . . . ." Rowley, 458 U.S. at 198.

The District's 39-page proposed IEP contains each of the mandated elements under the IDEA regulations. The District's IEP contains an appropriate level of detail and goals for Rachel to make meaningful educational progress. Because the Court concludes that the District's IEP was satisfactory under the IDEA, the Court's analysis need not go any further.

VI. Conclusion

After an independent review of the administrative record, the Court finds that the District's IEP would have provided Rachel meaningful benefit for speech and language development. The District's proposed speech therapy is within suggested guidelines, and the speech and language goals would have been reinforced in the classroom. Furthermore, the District's IEP contains appropriate detail for goals and implementation of the District's plan for each academic subject.

An appropriate Order shall issue separately.